**CITY OF DETROIT et al., Plaintiffs,**

v.

**GRINNELL CORPORATION et al., Defendants.**

**MANHATTAN–WARD, INC., et al., Plaintiffs,**

v.

**GRINNELL CORPORATION et al., Defendants.**

**1225 VINE STREET BUILDING, INC., et al., Plaintiffs,**

v.

**GRINNELL CORPORATION et al., Defendants.**

**Nos. 68 Civ. 4026, 4028 and 4027.**

United States District Court,
S. D. New York.

Dec. 27, 1972.

David Berger, Philadelphia, Pa., for plaintiffs; H. Laddie Montague, Jr., Philadelphia, Pa., of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant Grinnell Corp.; Denis McInerney, Thomas F. Curnin, Allen S. Joslyn, Joseph Foley, New York City, of counsel.

White & Case, New York City, for defendant American District Telegraph Co.; Macdonald Flinn, Thomas McGanney, New York City, of counsel.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendant Holmes Electric Protective Co.; Francis S. Bensel, Bud G. Holman, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant Automatic Fire Alarm Co.; William F. Sondericker, Joseph M. Burke, New York City, of counsel.

Lord, Day & Lord, New York City and Harold E. Kohn, Philadelphia, Pa., for David Berger; Herbert Brownell, Gordon B. Spivack, New York City, of counsel.

Weil, Gotshal. & Manges, Liebman, Eulau, Robinson & Perlman, and Parker, Chapin & Flattau, New York City, liason counsel for subscriber plaintiffs; Ira M. Millstein, A. Paul Victor, Jane R. Levine, Alvin M. Stein, Barry J. Brett,

Herbert Robinson, New York City, of counsel.

Mesirov, Gelman, Jaffe & Levin, Philadelphia, Pa., for 20 claimants; Harvey S. Kronfeld, Anthony E. Creato, Philadelphia, Pa., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for claimants General Motors Corp., Ford Motor Co., and others; Simon H. Rifkind, Max Gitter, New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for claimants Dollar Savings Bank of New York, United Mutual Savings Bank, and others; George D. Reycraft, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for claimant R. J. Reynolds Industries, Inc.; Taggart Whipple, Daniel F. Kolb, New York City, of counsel.

Donovan, Leisure Newton & Irvine, New York City, for claimants American Cyanamid Co. and Shulton Inc.; Samuel W. Murphy, Jr., Thomas F. Munno, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for claimant Graybar Electric Co.; Thomas A. Shaw, Jr., New York City, of counsel.

Royall, Koegel & Wells, New York City, for claimant Twentieth Century-Fox Film Corp.

Cutler & Cutler, New York City, for claimant Container Corp. of America; Max Cutler, New York City, of counsel.

Botein, Hays, Sklar & Herzberg, New York City, for claimant Hart Schaffner & Marx and others; Nathaniel Whitehorn, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for claimant SuCrest Corp. and others; Henry J. Silberberg, New York City, of counsel.

Mortimer M. Lerner, and Sidney L. Cramoy, New York City, for claimant Fran Stef Corp.

Trubin, Sillcocks, Edelman & Knapp, New York City, for claimant Alexander's; David N. Goldsweig, New York City, of counsel.

Howrey, Simon, Baker & Murchison, Washington, D. C., for claimant Bay Shore Shopping Center and others; William Simon, G. Joseph King, Washington, D. C., of counsel.

Wald, Harkrader & Ross, Washington, D. C., for claimant Wald, Harkrader & Ross; Joel E. Hoffman, Washington, D. C., of counsel.

Leon P. Calafiura, New York City, for claimant Sanders Camera Shops, Inc.

Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for three claimants; M. Rust Sharp, R. W. Stewart, of counsel.

Claude Jack, New York City, for claimant Celanese Corp.

Richard Sexton, Brooklyn, N. Y., for claimant SCM Corp.

Richard H. Lange, New York City, for claimant Mohasco Industries, Inc.

Walter D. Ford, Wilmington, Del., for claimant E. I. duPont.

METZNER, District Judge:

The parties have moved for court approval of a proposed settlement of three national class actions and for a reasonable counsel fee in what has been known as the "central station protection service" litigation.

## I. THE SETTLEMENT

In 1966 the Supreme Court affirmed a judgment in favor of the government in an action seeking relief for alleged violations of §§ 1 and 2 of the Sherman Act by Grinnell Corporation and three of its affiliates, American District Telegraph Company (ADT), Holmes Electric Protective Company (Holmes) and Automatic Fire Alarm Company of Delaware (AFA). 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778. The decree enjoined the defendants from violating the law and required divestiture by Grinnell of its affiliates. A final decree was entered by the district court on July 11, 1967.

As can easily be imagined, a slew of private actions were then instituted seeking treble damages from the four defendants. 68 such actions were filed

in this court and all of them were assigned to me pursuant to Rule 2 of the General Rules of the Southern District of New York. In addition, 16 of the cases pending in other districts of the country were assigned to me for coordinated pretrial proceedings by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407.

The cases fell into two categories. One consisted of plaintiffs who were competitors of the defendants and the other consisted of plaintiffs who were subscribers to defendants' services. It became apparent that coordinated or consolidated pretrial proceedings would be difficult in this litigation because the claims of one group required proof that might defeat the claims of the other. The competitor plaintiffs wanted to show that in the cities where they operated, the defendants exercised monopoly power to drive prices down in order to force those plaintiffs out of business. Subscriber plaintiffs, on the other hand, wished to show that the defendants used their monopoly power to fix an unreasonably high price for the services rendered. A great many of the subscriber plaintiffs were located in cities where competition existed.

23 of the 24 competitor cases have now been settled for a total of some $12,000,000. A subscriber suit by the United States government has likewise been settled. 56 other subscriber actions are still pending: 3 of these are the national class actions with which we are now concerned.

The *Vine Street* action is brought on behalf of all owners and operators of retail stores, shopping centers, office buildings, apartment houses, hotels and motels, theatres and other amusement buildings and private institutions situated throughout the United States. The *Manhattan-Ward* action is brought on behalf of all owners and operators of industrial and commercial manufacturing plants situated throughout the United States. The *City of Detroit* action is brought on behalf of all state, county, and local government and public bodies,

and public schools and school districts situated throughout the United States. By definition these national class actions would embrace the claims of all pending subscriber actions except 3 state-wide class actions on behalf of governmental entities in those states which are excluded from the proposed settlement.

The proposed settlement is predicated upon an assumption that the actions are proper class actions. The parties had briefed and argued the class action issue and while the matter was *sub judice* the court was requested not to proceed with determination of the issue because the parties were engaged in settlement negotiations. The effect of the existence of this issue will be discussed later on in this opinion. The notice of settlement mailed to subscribers also included the material required by Fed.R.Civ.P. 23(c)(2) for exclusion and appearance by counsel.

The settlement offer contemplates the payment of $10,000,000 by the defendants to cover all 3 national class actions. Grinnell will contribute $3,850,000 toward the settlement in 3 installments through 1974. ADT will contribute $4,850,000 in 3 installments through 1974. Holmes will contribute $900,000 in 2 installments, payable on January 15, 1975 and January 15, 1976. AFA will contribute $400,000 payable in 2 installments on the same dates as Holmes. All deferred payments are to bear interest at 1% over the prime rate existing during the period.

The damage period covers 11¼ years from April 13, 1957 to July 11, 1968. The starting date is 4 years prior to the institution of the government enforcement action, which represents the usual statute of limitations period. Clayton Act § 4B.

Notice of this application was mailed to some 89,000 customers of defendants who had total billings of some $800,000,000 during the damage period. In addition, publication of the notice appeared for 3 consecutive weeks in both the Wall Street Journal (all regional editions) and the New York Times.

14,156 customers filed claims involving total billings of $330,525,000. $37,979,000 of these claims has been challenged either by the plaintiff or the defendants. In addition, the total billings included excise taxes of about $25,000,000.

The proposed settlement would thus afford a recovery of from 3.2% to 3.7% of the total billings of customers who filed claims. The exact percentage will depend on the resolution of the contested claims and whether or not the amount of excise taxes is included in the computation.

■■ Rule 23(e) requires that a class action may be compromised only with the approval of the court. Approval should be given if the settlement is fair, reasonable and adequate. The settlement hearing should not be turned into a trial or a rehearsal of the trial. Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972). The evaluation of the proposed settlement in this type of litigation against this standard requires an amalgam of delicate balancing, gross approximations and rough justice. Saylor v. Lindsley, 456 F.2d 896, 904 (2d Cir. 1972).

In Protective Committee v. Anderson, 390 U.S. 414, at pages 424–425, 88 S.Ct. 1157, at page 1163, 20 L.Ed.2d 1 (1968), the Court said:

> "Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation."

■■ The very purpose of a compromise is to avoid determination of sharply contested issues and to dispense with wasteful litigation. In re Prudence, 98 F.2d 559 (2d Cir. 1938). At the same time the court must weigh the relative advantages and disadvantages of the positions of the respective parties. In Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960), the court said:

> "But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements."

■ In addition to considering the strength of the case for the plaintiffs against the amount offered in settlement, the court must weigh the judgment of counsel for plaintiffs, the extent of support from interested parties, and the presence or absence of good faith bargaining. State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 741 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

Objections to the proposed settlement come from a very small number of claimants, only one of whom had previously filed an individual lawsuit. 150 of the 14,000 claimants were represented by attorneys in filing their claims, and only 5 of these attorneys object to the settlement. Their clients represent ½ of 1% of the billings for all claimants.

At the first pretrial conference called to coordinate the pretrial proceedings for all 84 cases, the court appointed a committee of 3 attorneys (the "Troika"), selected by counsel for all subscriber plaintiffs, to represent those plaintiffs in future proceedings. Such a committee was designed to afford greater efficiency in presenting or defending against motions and in the conduct of discovery. 2 of these 3 attorneys represent plaintiffs (some with multiple installations) who have joined the class as claimants and do not object to the settlement. They also represent other clients who have filed claims. 11 of the individual subscriber plaintiffs have filed

claims in the proposed settlement. Only 36 of the individual plaintiffs have opted out and their cases remain pending in addition to the 3 statewide governmental class actions. I understand that these 39 cases represent $50,000,000 of billings. I point out these facts as an indication of the views of attorneys who have lived with this litigation for a number of years and are fully familiar with the discovery as it exists today.

That discovery is huge. It consists of everything that was produced in the government suit (documents, depositions, and transcript of the trial, as detailed in 236 F.Supp. 244 at 247), documents produced and depositions of the defendants taken in the *Sentinel* case in the Eastern District of Pennsylvania· (this was a competitor case which was settled before trial), and the tremendous amount of information furnished to subscriber plaintiffs in the consolidated pretrial proceedings in this court. One interrogatory alone, propounded by the Troika, required 3,000 pages for its answer. All of the above material was placed in a depository originally leased at 205 Pearl Street in this city. The court personally visited those premises and observed the volume and organization of the material in some 260 filing drawers and open shelves.

■ The main objections to the settlement are voiced by a law firm in Philadelphia on behalf of 20 claimants who had total billings of $270,000 during the damage period. Parenthetically, counsel for the class plaintiffs is also from Philadelphia, where the national class actions and 3 other individual subscriber cases were originally filed. Objecting counsel admits that he has expertise in the field of antitrust litigation and that some of the claimants he represents are substantial businesses. $3\frac{1}{2}$ years after the statute of limitations has run this firm appears and projects an astronomical estimate of what is involved in this case. An example of this magnifying glass approach is found in counsel's reference to $800,000,000 in total billings for the $11\frac{1}{4}$ year damage period as a basis to be used in evaluating the proposed settlement. Claimants with only $330,000,000 in billings have shown an interest in filing claims, and it is this figure which must be considered as the maximum in evaluating the settlement.

Of course, the amount of damage with which we are concerned is not the total billings of $330,000,000 but only the portion of that figure attributable to the exercise of monopoly power or restraints of trade by defendants.

■ The objectors refer to what they call the net settlement figure in arguing the inadequacy of the offer. This completely ignores the obligation of the beneficiaries of the settlement to pay their share of the cost of the litigation which results in a recovery for them. Whatever the net may be, the fact is that the defendants are offering to pay $10,-000,000, and this is the figure to be evaluated. The amount of counsel fees is for the court's determination and will be discussed later on in this opinion.

■ Objection is made to the failure of the attorneys for the class to obtain the services of an expert economist to aid in determining the potential damages. See Proposed Manual for Complex Litigation (Feb. 1972), ¶ 1.46. This objector has stated that he has consulted with an expert who is ready to testify that the provable damages after trial should run between 3% and 7% of total billings. It is not necessary to have an evidentiary hearing with this expert as a witness, since I consider that the proposed settlement of 3.2% to 3.7% is "well within the ball park" of this offer of proof. I should point out that the damage period here is $11\frac{1}{4}$ years, whereas in most of the settlements achieved in other class action antitrust cases, the period has been 4 years which is the statute of limitations for such actions. If the proposed settlement here is evaluated on a 4-year basis, the figure would fall between 9% and 11%.

■ Objectors proceed to enlarge on their 3–7% figure by saying that since

this is an antitrust suit the figure should be trebled, which raises their economist's figure to 9–21%. In settling these cases, negotiations are usually conducted on a single damage basis. One of the reasons for this is that defendants are not admitting the type of wrongdoing contemplated in a final judgment after trial. This is somewhat akin to the consent judgment in a government enforcement action, with its usual "without admitting the truth thereof" clause. It facilitates the disposition of the litigation.

One of the objectors points to the so-called O'Brien memorandum in urging this court to refuse to approve the settlement. Frankly, it does not have the impact of the famous Raskob report which gave life to the government enforcement action against du Pont and General Motors. United States v. du Pont & Co., 353 U.S. 586, 600–602, 77 S. Ct. 872, 1 L.Ed.2d 1057 (1957); Gottesman v. General Motors Corp., 279 F. Supp. 361, 365 (S.D.N.Y.1967). The O'Brien memo must be read in context and does not entitle the plaintiffs to an assessment of damages, as hoped for. It must be read in its entirety and then compared with the answering McDonald memorandum and the factual material produced in the pretrial proceedings.

The objectors also place a great deal of emphasis on what they claim is an issue of fraudulent concealment in this case. Of course, the existence of such a factor would have a distinct bearing on the time period to be embraced by any settlement.

While plaintiffs have alleged fraudulent concealment in their complaints, I doubt that such an allegation is ever absent in litigation of this type. It appears in the complaints of many of the individual subscriber plaintiffs in this litigation. No one has pressed it in those cases, where discovery begins with 1957.

The relationship between the defendants was public and common knowledge for a long time. The first private suit was filed in Philadelphia a year before the government even instituted its enforcement action. I find no substance to the objectors' claim that fraudulent concealment exists in this case.

It seems to me that the objectors have failed to fully use the depository to come up with a factual basis for their arguments. The first notice of this settlement was sent out in the middle of December 1971 and the hearing was held on May 24, 1972. The objectors claim they spent 4 days in the depository during that time, reading opinions, some depositions and some documents in the government case. To impress the court with the poor condition in which they say they found the depository, they refer to the fact that 10 drawers were locked and that the defendants refused to open them despite repeated requests. These drawers were locked because they contained documents under a protective court order in a case which had been settled in Pennsylvania and which had not been transferred here. In any event, there were 250 other drawers that could have been helpful.

I would again make special note of the huge amount of discovery in the subscriber cases, both in answers to interrogatories and document production. There is no indication that this material was reviewed by the objectors. The answers to interrogatories 18 and 19 furnish abundant information regarding the liability and damage issues in this litigation. I can only assume that the acquiescence in the settlement by counsel in 11 individual subscriber actions is based on the information they obtained from this discovery.

In any event, whether we are involved with a potential 3% to 7% or a 9% to 21% recovery, the hazards of litigation must be evaluated. To place the heaviest burden on the fairness of the proposal, the risks of litigation must be measured against the optimum recovery —treble damages of 21% on an 11-year damage period.

■ It is true that the government judgment will be prima facie evidence in these cases, but it does not follow, as argued by some objectors, that this leaves open only the damage aspects of the litigation. The issue of relevant market is a close one. The dissents of the 3 justices in the government case were based on their disagreement with the majority on this issue. Justice Harlan was of the view that relevant product market was not sufficiently proved. Justices Fortas and Stewart were of the view that neither the relevant product market nor the geographical market was properly defined. Judge Wyzanski, who tried the original case and then conducted the hearings after remand by the Court, has said that if he had read Justice Fortas' dissent before he rendered his original determination, he would have followed the justice's reasoning because "it went to the heart of my error."

From my exposure to these cases, in the context of private litigation on behalf of competitors and subscribers, I find additional problems with which the Court was not faced. The definition of relevant market, both geographical and product line, may have been proper for the government enforcement suit on the theory of monopolization. It does not follow that it is proper for the private litigation with which we are concerned.

Secondly, liability in the government suit was predicated in the main on the existence of monopoly power. 384 U.S. at 566, 570, 584 and 586, 86 S.Ct. 1698, 16 L.Ed.2d 778. Counsel for a number of competitor plaintiffs, who also represent subscriber plaintiffs not objecting to the settlement, have stated that in their opinion the only persons who suffered damages from the exercise of this power were the competitors. The evidence upon which they relied to settle their competitor cases showed that in cities in which defendants did not have any competition the rates charged were "normal" and "competitive," while in cities in which competition existed "defendants were charging cut-throat competitive rates in an attempt to force competitors out of business." Of course, the beneficiaries of this latter competition would be subscribers to defendants' services in such cities. Approximately 8,800 of the 14,156 subscribers who filed claims come from such cities. Most of the objectors also come from such cities. Incidentally, Judge Wyzanski pointed out that even in cities in which there was no competition the defendants were not always able to charge their minimum basic rates. 236 F.Supp. at 254.

■ The impact of these factors strongly favors the settlement. This is so even though the court is aware that the fact of damage, which is an element of liability, is satisfied by proof of some injury flowing from defendants' alleged illegal acts, and that "inquiry beyond this minimum point goes only to the amount and not the fact of damage." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Trans World Airlines v. Hughes, 308 F.Supp. 679, 685 (S.D.N.Y.1969).

■ Because of the disparity in charges between cities and the various competitive local factors, defendants are ready to contest each of the 14,156 claims on the amount of damages, even though liability may be proven. Assuming, for the moment, that the class action status is resolved in favor of plaintiffs, interesting trial problems are present, since the case is to be tried to a jury. Defendants' right to a jury determination of the damages for each asserted claim is not lost because this is a class action. While Rule 23 has been given broad application, no one suggests that it has repealed the Seventh Amendment.

After appropriate discovery by the defendants has been obtained, and the litigation has not even reached that point yet, it is fair to assume a minimum of one hour for the presentation and defense of each claim. Thus, we can look forward to about 14,000 trial hours on the damage claims alone. With an average of 6 hours a day devoted to ac-

tually hearing testimony, the trial will take some 2,300 days or about 11 years. Assuming the greatest cooperation possible among advocates strongly prosecuting or defending a position, you might dispose of the matter within 5 years. I speak of strong advocacy on the part of the claimants because if there is anything less you may not assume a maximum recovery of 21%.

The questions of administration raised by such a trial are: Do you use the same jury to decide the entire damage issue? Does the same judge preside over this trial to the exclusion of his other more pressing work, such as criminal trials or applications for preliminary and permanent injunctions? Or is the judge relieved of all other assignments? Even if several judges and juries are used (including perhaps fragmentizing the proceedings in cities), a huge amount of judicial time of any single judge and his court personnel would be devoted to the matter. Even though the defendants may ultimately be found liable to some or even all of the claimants, this demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement. See Protective Committee v. Anderson, *supra.*

The across-the-board nature of the settlement might be objected to because some claimants will receive less than they are entitled to, as a percentage of actual damage suffered, while others will receive more. This is apparent from the disparity in charges and the actual competitive picture from city to city. As I stated above, most of the objectors to the settlement appear to be located in areas where competitor facilities existed. However, the formula adopted is the only realistic one to be considered in determining whether the settlement should be approved.

 Another factor to be considered here is the financial ability of all or any of the defendants to satisfy the maximum amount which the objectors contend will be theirs if the litigation goes to judgment. The prospect of a bankrupt judgment debtor at the end of the road does not satisfy anyone involved in the use of class action procedures. I can understand that some installment payments under the proposed settlement may have implications other than an inability to pay. Under the proposed settlement, 87% of the recovery will be paid within 2 years. However, the 2 defendants with the smallest contributions, AFA and Holmes, will pay their $1,300,-000 in 4 installments. It is clear that at least as to these 2 defendants the extended time for payment is attributable to financial inability.

Finally, we come to the issue of whether the actions may be maintained as class actions. I have referred above to the problem of relevant market. Obviously, any change in the definition of relevant market, either geographical or product line, after a trial of the issue of liability or as an issue in a separate trial, would seriously affect the determination of the existence of a national class action.

Assuming that the definition of the relevant market remains the same, it does not follow that a national class action may be maintained under the guidelines of Rule 23(a) and (b). The question of impact, essential to the determination of liability in a private damage suit, presents difficulties in the context of a national class action. There are differing competitive climates in each of the areas involved. All the members of a class did not contract for the same services, even in the same city.

Defendants properly point out that a large number of the individual subscriber actions, instituted prior to the bringing of these asserted class actions, involved total billings less than that claimed by the named plaintiffs in the class actions. Consequently, it would appear that as far as these plaintiffs are concerned the class action vehicle in this antitrust litigation is not necessary to adequately protect their rights. They cannot assume the self-anointed role of protector of the small claimant through

use of class action procedures, with the pot of gold at the end of the rainbow for counsel. If these plaintiffs were successful at trial, they would be compensated with treble damages and an award of counsel fees charged against the defendants as an added cost of the litigation. Clayton Act § 4. There are separate rules for the determination of counsel fees after judgment in this type of case, and the fees are not tied to the amount of recovery. Trans World Airlines v. Hughes, 312 F.Supp. 478 (S.D. N.Y.1970).

Finally, on the issue of class action status, I refer to the discussion above regarding the manageability of this litigation. What was said there is pertinent here.

These factors which bear on whether a class action is maintainable in this litigation show that the resolution of that question is neither easy nor free from doubt. The uncertainty as to resolution of the problem has substantial impact in determining the reasonableness of the settlement. The statute of limitations has long since run in this litigation. Denial of class action status would preclude recovery by any of the claimants because none of them can say that they relied on the existence of these actions for not having instituted a timely suit.

██ It is clear to this court, after reviewing all of the problems in this litigation, and following the established guidelines for evaluating offers of settlement, that $10,000,000 is a fair and reasonable settlement of the claims embraced in the 3 national class actions. The settlement is approved.

## II. COUNSEL FEES

We now address ourselves to counsel's application for a reasonable fee for his services rendered to the class action plaintiffs. Counsel has requested a flat 25% of the $10,000,000 settlement fund, or $2,500,000, as reasonable compensation for his efforts. Added to this would be the necessary disbursements incurred in the course of the litigation.

Opposition to this fee application has been voiced by a number of claimants who are satisfied with the settlement in addition to those who opposed it. The opposition was vehement and strenuous. A separate day had to be set aside for oral argument by the objectors to the fee application. At the outset, I must repeat what I have said numerous times in the past. A flat 25%-of-recovery formula is nonexistent as far as I am concerned. There are many factors to be considered in fixing the value of professional services in class actions instituted on a contingent fee basis. See Proposed Manual for Complex Litigation, *supra*, ¶ 1.47. These factors will be discussed as we review counsel's activities in these cases.

Counsel has detailed some 6200 hours spent on this litigation by senior and junior attorneys in his law firm and paraprofessionals. Such paraprofessional aid is gaining acceptance by the bar, and can reduce overhead expense in the operation of a law firm while increasing the quality of the services rendered. Brickman, Expansion of the Lawyering Process Through A New Delivery System, 71 Col.L.Rev. 1153 (1971). Hopefully, paraprofessionals might also reduce the cost of litigation to persons with valid claims who, even though not impecunious, cannot afford the fees for the effective advocacy necessary to successfully prosecute those claims.

Counsel estimates that a minimum of an additional 1000 hours will be necessary to complete the administration of the settlement. This will include the determination of challenges to some 700 claims and problems attendant to the ultimate distribution of the settlement fund.

Two comments have been made as to the number of hours reported. First, it is pointed out that half of the time spent is referrable to paraprofessionals. Second, there is no delineation between time spent prior to reaching the settlement agreement and time spent after

the signing of the order setting in motion the procedures for approving the settlement. These observations will be kept in mind in weighing the time factor in fixing the fee.

▮▮▮▮ The weight to be given hours spent in arriving at a reasonable counsel fee in the contingent fee class action is less than that given in a Clayton Act § 4 situation. Cf. Trans World Airlines v. Hughes, 312 F.Supp. 478 (S. D.N.Y.1970). However, it is still a factor, and counsel must be prepared to submit a record of the time spent in these cases. Fox v. Glickman Corp., 253 F.Supp. 1005 (S.D.N.Y.1966). The court also considers that the existence of a contingent fee arrangement itself should be given appropriate consideration in fixing this fee.

I am mindful of Professor Hornstein's oft-quoted statement, constantly referred to by counsel for plaintiffs in class actions, that in a contingent fee case "One thousand plodding hours may be less productive than one imaginative, brilliant hour." Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv.L.Rev. 658, 660 (1956). However, in applying that observation we must examine the benefit conferred on the class and determine whether it flows from counsel's skillful operation or plodding effort.

These class actions were instituted just 2 months before they would have lost the benefit of the tolling provisions of § 5(b) of the Clayton Act. For this, counsel deserves much credit. If the cases had not been filed when they were, the objectors to the fee and all other claimants would be receiving nothing or only a small percentage of what they will now receive. The damage period would have been limited to 4 years, commencing 3 years after the institution of the government suit. This obviously would affect the size of any settlement offer by defendants. In addition, the prima facie effect of the government decree would be affected. Cf. Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir. 1969). Plaintiffs have the advantage of a damage period of 11¼ years, going back to 4 years prior to the institution of the government suit.

None of the claimants can say that, but for these class actions, they would have instituted individual suits or class actions prior to September 1968 to protect their interests. This fact gains added significance when we recall that 55 individual subscriber actions were timely instituted, and some of the objectors here dwarf any of such plaintiffs in financial resources. On the other hand, the existence of this number of individual suits, many instituted more than a year prior to these class actions, somewhat diminishes credit to counsel for having the foresight to bring the suits.

In his fee application, counsel has detailed his work with regard to the prosecution of these claims. He states that he was a member of the Steering Committee for all plaintiff actions. This was an informal committee in operation prior to the assignment of all of the cases to me either pursuant to Rule 2 or § 1407. Subsequently, I gather that counsel worked with the Troika in the following areas: (a) drafting the motion for production of documents, (b) preparing the interrogatories submitted to defendants on behalf of all subscriber plaintiffs, and (c) resisting defendants' motion for partial summary judgment. He was involved in resisting the motion by AFA to dismiss all of the actions against it and was involved in the companion motion to substitute AFA of New York as a party defendant.

All of this activity was important. The production of documents and the answers to interrogatories are so necessary in antitrust litigation. The material here included much that was not included in the government discovery. The information furnished by the defendants obviously went a long way toward developing the basis for a settlement of the class actions. The partial summary judgment motion brought by the defendants, involving the tolling provisions of the Clayton Act, was bitterly

fought by all plaintiffs. Russ Togs, Inc. v. Grinnell Corp., 304 F.Supp. 279 (S.D. N.Y.1969), aff'd, 426 F.2d 850 (2d Cir.), cert. denied, 400 U.S. 878, 91 S.Ct. 119, 27 L.Ed.2d 115 (1970). There then followed extensive briefing and oral argument as to whether these lawsuits should be granted class action status. While the matter was *sub judice*, the court was requested to withhold disposition pending the outcome of settlement negotiations.

With the submission of the proposed settlement, counsel (as a member of the Class Action Committee) undertook the supervision of the procedures set forth in Settlement Order No. 1. Following that order over 14,000 claims were filed and processed, corrections were sought and challenges entered. Finally, counsel has vigorously participated in the proceedings to approve the settlement.

Counsel has been an active participant in many of the class action antitrust suits filed in the last 5 years in the various district courts. 9 of these have been disposed of and 10 are still pending. There is no doubt that counsel has acquired, as a result of these experiences, an expertise in the handling of such matters.

Counsel seeks credit for some items of accomplishment which I find unjustified. For example, neither the extent of the dissemination of the notice nor the inclusion of the settlement terms therein should be given much weight. Certainly this court would never approve, under the facts of this case, any lesser notice than was given. Furthermore, notice of the settlement is required by Rule 23(e). Neither is the court persuaded that any weight should be given to the fact that counsel is not requesting fee participation in the interest to be paid by the defendants on the deferred payments. The installment payments are for the benefit of the defendants. The claimants are being deprived of the use of the money because of the installment procedure, and are entitled to interest as compensation for that loss.

■ I should also point out that the existence of the government investigation and the existence of a judgment available for use under § 5(a) of the Clayton Act are factors to be considered in determining the reasonableness of the fee.

■ This is a big case. $10,000,000 is not a small sum of money. The dollar amount of claims filed compared to total billings is high. It is true that class actions serve a useful purpose in protecting the individual whose claim might be so small as to not justify independent action. Such actions involve the undertaking of risks by counsel and justify the use of a percentage of recovery as one of the factors in evaluating the requested allowance of counsel fees. However, it would appear that the amount of risk involved does not increase tenfold simply because we are concerned with a $10,000,000 settlement instead of a $1,000,000 settlement. After a certain point is reached, the size of the counsel fee must be limited.

■ The court does not necessarily look to the fee a claimant individually would be willing to pay to recover his small share. These cases should be viewed from the adequacy of the fee to be received by counsel commensurate with the risks he has taken, the work he has done, the results he has obtained and the *pro bono publico* efforts involved in this type of litigation.

■ Under all the facts and circumstances which I have outlined above, I find that a fee of $1,500,000 is adequate in these 3 cases. The Proposed Manual for Complex Litigation, *supra*, states at page 43 that "Once adequate compensation sufficient to provide the motive for representation of classes is provided, no further incentive is required." I am sure that petitioning counsel will not be deterred from becoming involved in any future class actions because of the size of the fee allowed here. I am equally convinced that other attorneys will not be dissuaded from protecting the poor litigant in similar circumstances.

Petitioning counsel is also allowed $14,918.73 as out-of-pocket expenses to April 20, 1972. Requests for further reimbursement of expenses will be entertained only on an application setting forth categories and dates when the expenses were incurred.

An interesting question has been presented by the application of the members of the Troika and a fourth attorney to participate in whatever fee is allowed to counsel for the class action plaintiffs. In preparing for the first pretrial conference of counsel in all 84 cases, I sent a 2-page letter of proposed procedures to counsel, dated May 21, 1969. That letter contained a directive that counsel for all plaintiffs meet the day before the pretrial conference and select one of their number to be designated as lead counsel. Lead counsel is necessary for the efficient conduct of pretrial proceedings as envisaged by the coordinated proceedings under 28 U.S.C. § 1407. Such designation would have been required even if the court were only concerned with the 68 cases filed in this district.

At the pretrial conference held on June 17, 1969, the court was advised that counsel had decided that because of the huge number of plaintiffs' attorneys involved, the work of lead counsel should be distributed among 3 law firms rather than one. The recommendations for appointment were Mr. Millstein, of Weil, Gotshal and Manges, Mr. Robinson, of Liebman, Eulau, Robinson and Perlman, and Mr. Stein and Mr. Brett, of Parker, Chapin and Flattau. All of those designated were well versed in the intricacies of antitrust law and class action proceedings and members of distinguished law firms. The designations were formalized in Pretrial Order No. 1 dated July 2, 1969.

These attorneys contend that a great deal of the benefit conferred on the class by the settlement flows directly from their efforts. It is their position that plaintiffs' counsel in the class actions should not receive more than 20% of the settlement as a fee and that they are entitled to ¼ of that amount, or ¼ of whatever amount the court ultimately grants. Another attorney who claims that his participation in the pretrial proceedings aided the settlement of the class actions requests 10% of the fee awarded to counsel for the class.

The questions raised by this application are not to be confused with the problems existing in connection with reimbursement for *expenses* incurred in acting as lead or liaison counsel in cases transferred for coordinated pretrial proceedings by the Panel on Multidistrict Litigation. See Proposed Manual for Complex Litigation, *supra* at 49. I understand that the Panel is presently considering those problems where there is failure of voluntary cooperation.

There is no doubt that a tremendous amount of legal services was rendered in connection with this litigation, all of which has been detailed and referred to in other portions of this opinion. However, the affidavits submitted by opposing counsel on this phase of the application resemble the testimony of the drivers of 2 cars describing how they collided.

I subscribe to the principle that counsel who contributed to the benefit conferred on the class are entitled to compensation for that effort. This is true even though counsel did not appear in the particular actions being settled. Representation of claimants does not give an attorney standing on the issue involved. Counsel seeking a portion of this counsel fee were privately retained and instituted individual actions on behalf of their clients. It is their activities in this related litigation that gives them standing to assert a claim. Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); United States v. ASCAP, 466 F.2d 917 (2d Cir. 1972).

Counsel will be advised of the date for a hearing on the application for an apportionment of the fee allowed for services rendered in obtaining a settlement of the national class actions.

So ordered.