560 F.2d 1093
 CITY OF DETROIT et al.
v.
GRINNELL CORPORATION et al., Bay Fair Shopping Center, Exxon
Corporation, Friendswood Development Company,
International Lubricant Corporation and
Shell Oil Company, Claimants-Appellants.
 Nos. 316, 1202 and 1203, Dockets 76-7252, 76-7253 and 76-7254.
 United States Court of Appeals,
Second Circuit.
 Argued April 13, 1977.
Decided Aug. 30, 1977.
 
 Gordon B. Spivack, New York City (Lord, Day & Lord, Herbert Brownell, Thomas D. Brislin, New York City and David Berger, P.A., David Berger and H. Laddie Montague, Jr., Philadelphia, Pa., of counsel), for class representatives-appellees.
 Robert E. Hebda, Washington, D.C. (Howrey & Simon, William Simon and G. Joseph King, Washington, D.C., of counsel), for class members-claimants-appellants.
 Before CLARK,* Associate Justice, and MOORE and MULLIGAN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 This is the second appeal taken by class members-claimants Bay Fair Shopping Center, et al. ("appellants") from an award of counsel fees to David Berger, Esq. and his law firm, David Berger, P.A. ("appellee").[1] The fees were awarded for work appellee performed in obtaining a common settlement fund for three national classes of plaintiffs in a suit brought against the Grinnell Corporation, et al. In the first appeal, City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974) ("Grinnell I" ), this Court reversed as excessive an initial fee award to appellee of $1.5 million out of the settlement fund of approximately $10 million. On remand, after a hearing, the district court awarded appellee counsel fees of $870,607.00 plus disbursements of $53,267.00 for employment of paraprofessionals and $27,505.00 for employment of accountants.[2] 1976-1 Trade Cases P 60,913.
 
 I.
 
 2
 The evolution of the litigation from which this appeal arises has previously been presented in detail by both the district court and this court. See City of Detroit v. Grinnell Corp., 356 F.Supp. 1380 (S.D.N.Y.1972), aff'd in part, rev'd in part, 495 F.2d 448 (2d Cir. 1974).
 
 
 3
 In 1961, the Government brought an injunctive action against Grinnell Corporation and several of its subsidiaries ("defendants"). The subsidiaries were in the business of providing "central station protection services" which monitored the premises of subscribers to guard against loss by burglary or fire. The Government's case was directed primarily to monopoly charges under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and was supported by evidence of predatory pricing in cities where the defendants encountered competition. On the basis of documentary evidence, the district court filed an opinion finding violations of both § 1 and § 2. United States v. Grinnell Corp., 236 F.Supp. 244 (D.R.I.1964). In 1966, the Supreme Court affirmed the district court in part, reversed in part, and remanded for hearings on relief. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). After over a year of further documentation, the district court entered a final decree on July 11, 1967.
 
 
 4
 Promptly following the Government's success, a number of the defendants' competitors and subscribers filed a host of private actions seeking treble damages for alleged predatory pricing. Over 80 private cases were eventually filed. The possibility of a suit against the defendants apparently came to the attention of Mr. Newberg, a lawyer working with Mr. Berger, in November of 1967, when he learned at a Harvard Law School function that a friend represented plaintiffs against "the manufacturers of burglar alarms who are charged with antitrust violations". Mr. Newberg asked his friend to send him a copy of the complaint already filed in Allied Stores Corporation v. Grinnell Corporation, et al., for Mr. Newberg suspected that his law firm might have clients "who may have claims" of a similar nature. App. at 1128. He promptly received a copy of the filed complaint and was advised that discovery had already been instituted and that a conference between plaintiffs' and defendants' counsel was scheduled for the near future. App. at 1129.
 
 
 5
 Thereafter, three class actions were brought in the Eastern District of Pennsylvania by appellee: City of Detroit v. Grinnell, 68 Civ. 4026, was brought on behalf of a "government class"; 1225 Vine Street Building v. Grinnell, 68 Civ. 4027, on behalf of a "commercial class"; and Manhattan-Ward, Inc. v. Grinnell, 68 Civ. 4028, for an "industrial class". These class actions were filed on July 10 and 11, 1968, exactly one year after the final judgment in the Government's action, and after the filing of most of the other private suits. The Judicial Panel on Multidistrict Litigation transferred all of the private actions to the Southern District of New York for consolidation and pretrial coordination. In re Protection Devices, 295 F.Supp. 39 (Jud.Pan.Mult.Lit.1968). All suits came under the aegis of Judge Charles M. Metzner.
 
 
 6
 In their complaints, the plaintiffs represented by appellee alleged violations of the Sherman Act as the United States had charged in its civil action against the defendants.[3] Moreover, the "findings of fact, conclusions of law and final judgment" in the Government's action were expressly "incorporated . . . by reference" into the class complaints. App. at 43. Attached to the complaints was a copy of the final decree filed against the defendants on July 11, 1967.
 
 
 7
 To facilitate the handling of so many cases, Judge Metzner designated three firms, referred to collectively as the "Troika", to carry the laboring oar in prosecuting the suits. As the Court said: "The purpose for creating the Troika was to have a uniform discovery application". App. at 845. Appellee was never a member of the Troika. Apart from the Troika, a Steering Committee for subscriber plaintiffs was formed, to which Mr. Berger requested, on November 5, 1968, that his name be added. Mr. Berger also requested membership on the Steering Committee's Subcommittee on Discovery. App. at 1038. To this a member of one of the Troika firms replied that he was "sure those members of the Discovery Subcommittee with whom you will be serving will be delighted to have your services". App. at 1040.
 
 
 8
 On April 17, 1969, a memorandum from Mr. Newberg to Mr. Berger advised him that at a meeting of all plaintiffs' counsel in New York on April 16, 1969, "it was decided that since we have the benefit of a governmental trial, discovery should be kept to a simple level and an early trial date should be sought". App. at 1041. Thereafter, Mr. Newberg revised a draft of a motion for an order for production of documents and invited comments from the discovery subcommittee. App. at 1042. Appellee has characterized the motion as the "singularly most important and significant discovery tool in these cases". App. at 1004. Appellee did not take any depositions, and Mr. Berger did not himself visit the document depository, though others in his firm did. App. at 845-46.
 
 
 9
 Appellee helped to draft a response to a motion by defendants for partial summary judgment on grounds of the statute of limitations. That issue was later decided against the defendants in a decision affirmed by this Court. Russ Togs, Inc. v. Grinnell Corp., 304 F.Supp. 279 (S.D.N.Y.1969), aff'd 426 F.2d 850 (2d Cir.), cert. denied, 400 U.S. 878, 91 S.Ct. 119, 27 L.Ed.2d 115 (1970). Appellee stresses the importance of this statute of limitations victory and his prominent role in achieving it. Yet the initial draft of the brief in the Court of Appeals was prepared, pursuant to agreement, by Mr. Hoffman, counsel for a competitor plaintiff. Appellee had previously informed a member of the Troika that he wished to assist in the preparation of the appellate brief, and he did collaborate in preparing the final version. App. at 1032. The brief was formally filed by a member of the Troika. App. at 1074. Although the appeal was argued principally by Mr. Hoffman, Mr. Berger, having requested fifteen minutes time from the Court, did appear and argue.
 
 
 10
 In 1969, appellee moved to have the three national classes certified pursuant to Rule 23 of the Federal Rules of Civil Procedure. Oral argument was heard on June 18, 1971, with appellee presenting the case for certification.
 
 
 11
 Settlement negotiations between defendants and the national claimants had been instituted in early 1970. No progress was made, however, until immediately after oral argument on the certification issue. At that time, defendants offered to negotiate a settlement agreement which, after only four bargaining sessions, was concluded by a $10 million-plus-interest settlement fund for the three classes. The settlement was dated August 27, 1971, and was approved by the district court on December 27, 1972. Appellee was given responsibility for its administration.
 
 
 12
 Appellee had filed a petition, with supporting affidavits and a memorandum of law, for an attorneys' fee of.$2.5 million plus disbursements. App. at 101-220. After a hearing at which appellants' request to present evidence was denied, the district court awarded appellee $1.5 million, or approximately 15 percent of the entire fund. City of Detroit v. Grinnell Corp., 356 F.Supp. 1380 (S.D.N.Y.1972).
 
 
 13
 A number of members of the represented classes appealed that award, which this court reversed in the same decision that approved the settlement. Grinnell I, 495 F.2d 448 (2d Cir. 1974). The award was overturned as "excessive", displaying "too much reliance upon the contingent fee syndrome", and because the district court failed to hold an adequate evidentiary hearing for the determination of the fee. The case was remanded for the fixing of a fair and adequate fee, to be determined with a "jealous regard" for the rights of claimants to the settlement fund. 495 F.2d at 468-69.
 
 
 14
 On remand, on November 10, 1975, the district court held a hearing at which appellee offered testimony of three of its attorneys, whose direct testimony consisted of affirming as true the contents of affidavits verified by them and stating the work done on the cases, as well as documentary evidence, some of "reconstructed" time claims, in support of its request for counsel fees totaling approximately $1,248,000. In an opinion dated April 21 and supplemented on April 26, 1976, the district court awarded appellee fees of $870,607.00 plus costs for paraprofessionals and accountants. The district judge first determined the number of hours expended by each attorney on several relevant types of activities. Where possible, these findings were based upon contemporaneous time records, and where such records were unavailable, the court relied upon "reconstructions", or estimates, of time amounts. The court then assigned specific hourly rates to each of appellee's attorneys based on their experience and reputation. The resulting basic fee, often termed the "lodestar" figure, amounted to $352,765.75. The court then adjusted this award upward to $870,607.00, an increase of almost 150 percent, by doubling and tripling the fee for various categories of effort, on the basis of subjective evaluations of the "risk" of the litigation and the legal skills displayed by appellee. 1976-1 Trade Cases P 60,913.
 
 II.
 
 15
 Appellee was rewarded for its services pursuant to the long-established equitable fund theory, a doctrine designed to permit "fair and just allowances for expenses and counsel fees to (those) parties promoting the litigation. . . ." Trustees v. Greenough, 105 U.S. 527, 536, 26 L.Ed. 1157 (1881). The theory is that an attorney whose actions have conferred a benefit upon a given group or class of litigants may file a claim for reasonable compensation for his efforts. Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885). See generally, 7A C. Wright & A. Miller, Federal Practice and Procedure § 1803; Dawson, Lawyers and Involuntary Clients: Attorney Fees from Funds, 87 Harv.L.Rev. 1597 (1974).
 
 
 16
 But there has been a great deal of criticism of the implementation of the equitable fund doctrine under Fed.R.Civ.P. 23, much of it justified. Courts and commentators have repeatedly warned that too little judicial regard for the interests of the benefited class can easily result in lesser recoveries for intended beneficiaries because of massive fees for enterprising attorneys. See, e. g., Liebman v. J. W. Petersen Coal & Oil Co., 63 F.R.D. 684, 701 (N.D.Ill.1974); Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 30 (S.D.N.Y.1972); Dawson, Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849, 922-30 (1975).
 
 
 17
 In remanding this case in Grinnell I, we made clear our concern about this potential distortion of the equitable fund theory. The purpose of the equitable fee award was expressly stated as the " 'compensat(ion of) the attorney for the reasonable value of services benefiting the . . . claimant.' " 495 F.2d at 470, quoting Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161, 167 (3rd Cir. 1973). We directed the district court to begin its inquiry on remand by first calculating the basic value of appellee's services. This was to be derived by multiplying the numbers of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area. Once this base or "lodestar" rate was established, other less objective factors, such as the "risk of litigation", the complexity of the issues, and the skill of the attorneys, could be introduced to determine a final fee amount. But we specifically directed that the district court articulate with particularity those aspects of appellee's efforts which might lead it to increase compensation above the base rate. 495 F.2d at 473.
 
 Significantly, we cautioned that
 
 18
 "(f)or the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so. To this end courts must always heed the admonition of the Supreme Court in Trustees v. Greenough, supra, when it advised that fee awards under the equitable fund doctrine were proper only 'if made with moderation and a jealous regard to the rights of those who are interested in the fund.' 105 U.S., at 536." 495 F.2d at 469.
 
 
 19
 Milwaukee Towne Corp. v. Loew's Inc., 190 F.2d 561 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952), illustrates the point. That antitrust case, tried by the court, resulted in a judgment of $1,295,878.26 plus costs. The district judge entered on attorneys' fee award of $225,000. In reversing and directing that the attorneys' fee be reduced to $75,000, the Court of Appeals explained the difficulties that it had faced in the matter of reviewing the fee:
 
 
 20
 "We said in the beginning that the question was delicate and embarrassing and this is so not only because we recognize the ability of the attorney who rendered the services but also because of the high standing and character of the three lawyers who testified in support of the allowance. And we might also add this is so because of our respect for the ability and integrity of Judge Barnes, who fixed the allowance. Notwithstanding, the fabulous amount allowed is shocking to our sense of reason and justice." 190 F.2d at 569.
 
 
 21
 The Court also stressed the danger of failing adequately to protect the interests of the absent class members:
 
 
 22
 "(W)e are disturbed because in our sober judgment this exorbitant allowance, if it should become a precedent, is calculated to bring both the bar and the bench into public disrepute. More than that, the possibility that the anti-trust laws might develop into a racketeering practice should not be enhanced by the allowance of exorbitant and unreasonable attorney fees." 190 F.2d at 570.
 
 
 23
 Grinnell I emphasized that district courts should place primary reliance on the value of the time actually expended by fee applicants as determined by normal billing rates. Even when making allowance for such subjective factors as the "risk of litigation", the courts must be mindful that an attorney will receive an otherwise reasonable compensation for his time from the lodestar figure alone. Especially in class actions, judges determining fee awards should not be unduly influenced by the monetary size of the class settlement or judgment; a large settlement can as much reflect the number of potential class members or the scope of a defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel. Indeed, Grinnell I recognized that its effect would be to "minimiz(e) the important role traditionally played by the magnitude of the recovery . . . ." 495 F.2d at 471. As Judge Will stated in Liebman v. J. W. Petersen Coal & Oil Co., 63 F.R.D. 684 (N.D.Ill.1974), in awarding attorneys' fees in a private antitrust class action after a settlement thereof:
 
 
 24
 "We recognize . . . the desirability of encouraging the institution of actions seeking to vindicate the rights of members of a class who are unlikely or unable to do so individually. But we do not believe this should, or, in the light of an awakening sense of public services responsibility on the part of the bar, does in fact require the magnitude of financial reward which has been bestowed by some courts on successful plaintiffs' counsel." 63 F.R.D. at 697.
 
 
 25
 Henceforth, Grinnell I made clear, the touchstone for the fee was to be the actual effort made by the attorney to benefit the class. In making its decision, the district court was to act "as a fiduciary who must serve as a guardian of the rights of absent class members." Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Throughout Grinnell I, the thrust was that the "award must be made with an eye to moderation . . . ." 495 F.2d at 470.
 
 
 26
 In several respects, the fee award here fails to conform to these principles. Thirteen hundred and fifty hours out of appellee's total of 3575 hours involved the administration of the settlement. The lodestar fee for these services, generously compensated at an average of almost $90 per hour, amounted to over $120,000. There is no evidence in the record of any special character or quality in these administrative endeavors, nor does the record reveal that appellee's services in these essentially routine procedures were in any way atypical. Moreover, investing or distributing the class fund could begin only after the settlement had been fully negotiated and approved by the district court, so no "risk of litigation" factor should be considered in evaluating appellee's administrative talents. And while someone must spend long hours processing consumer claims, it is widely recognized that "it is not work requiring any great amount of professional skill." City of Philadelphia v. Chas. Pfizer & Co., 345 F.Supp. 454, 484 (S.D.N.Y.1972).
 
 
 27
 Yet the district judge, without any explanation, more than doubled this part of the award, marking it up to approximately $240,000. The court's failure to accompany this increase with any elucidation of its purpose or its justification directly contravenes the explicit mandate of Grinnell I that the district court specify fully the facts warranting any modification or its lodestar determination.
 
 
 28
 The district judge also trebled, from a lodestar sum of approximately $183,000 to approximately $550,000, the award for all other work by appellee except its fee applications. This enormous increase was thought to be justified by the "complexity of the issues . . . the competence with which they were presented, the success achieved and, most importantly, the risk of litigation". 1976-1 Trade Cases P 60,913 at 68,982.
 
 
 29
 But the court offered only a brief, rather conclusory analysis of the efforts of appellee in this litigation, constituting little more than the type of "mere listing of factors" which, we pointed out in Grinnell I, "standing alone, can never provide meaningful guidance". 495 F.2d at 470. Indeed, the district court's opinion entirely fails to justify this vast increase with the express factual findings and firm record support which Grinnell I requires. For example, the court offers no explanation for what unusual degree of skill or atypical quality it perceived in appellee's "General" category to justify a trebling of that category's billings to almost $50,000. The comparatively brief periods consumed in settlement negotiations must be considered in evaluating the size of assessment which a court of equity should levy on the beneficiaries. As the Third Circuit has explained, any increase in the lodestar compensation figure
 
 
 30
 "reflects exceptional services only; it may be considered in the nature of a bonus . . . The heavy burden of proving entitlement to such an adjustment is on the moving party." Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 118 (3rd Cir. 1976) (en banc ).
 
 
 31
 We have reviewed the pre-settlement facts at some length in an effort to appraise properly the factors which should be considered in making an award, since it is our function to define the "fair and just allowances" dictated by Trustees v. Greenough, supra. In so doing, we reject as having no relevant precedential value cases involving contingent fees arranged by agreements with clients; stockholders' derivative actions; and antitrust cases for which § 4 of the Clayton Act, 15 U.S.C. § 15, expressly provides an award of counsel fees against the losing defendant. Settled class actions are an entirely different category, and this case illustrates the reason.
 
 
 32
 Appellee began his efforts here with 21 clients whose total purchases from the defendants had amounted to just over $1,000,000. App. at 906. By expanding to three national class actions, however, he acquired a potential 89,000 additional "clients", though appellee and these possible claimants had never before communicated and certainly had not agreed to any fee arrangement. This client acquisition increased the potential total purchases figure to over $800,000,000, of which the purchases by the 14,000 actual claimants amounted to over $38,000,000. See 356 F.Supp. at 1384-85.
 
 
 33
 These three class actions do not appear to have been furthered exclusively by the ingenuity and perseverance of appellee. Mr. Berger and his firm were afforded the benefit of a complaint already filed and scores of suits arising out of the Government's prior action. As for the work performed, they did not create the interrogatories initiated by the Troika, though they did review them to make suggestions. They did not take any depositions. When the allegedly all-important statute of limitations motion came on, the record shows that another firm took the lead in briefing, with appellee making suggestions which we assume to have been valuable. Mr. Hoffman, of a Troika firm, appears to have made the principal argument on the appeal of the denial of that motion, though appellee at his own request also argued.
 
 
 34
 Appellee initiated and concluded settlement negotiations for the classes, and we assume that, brief though they were, the negotiations were conducted with the skill of a practitioner experienced in that specialty. But we have carefully reviewed the record and cannot find any evidence which would justify a conclusion that to this appellee or any other attorney experienced in antitrust matters these cases were "novel and complex". 1976-1 Trade Cases P 60,913 at 68,981. Indeed, appellee had the benefit of past handling of many similar plaintiffs' antitrust cases; they were acknowledged, as we acknowledge them, to be experts in this field.
 
 
 35
 The facts of this case are similar to those in Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8th Cir.), cert. denied, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952), where the Court of Appeals affirmed a judgment gotten after a jury trial but decreased the attorneys' fee, explaining:
 
 
 36
 "The case was an important one but it was not a pioneer but had many predecessors involving substantially the same issues. It contained no novel questions taxing the ingenuity or skill or counsel as prior cases in the same field had charted the course and procedure to be followed. In addition to this there was made available to counsel the decree and record in the (prior) case which in itself, by reason of the statute, made a prima facie case against the defendants which were parties to that action so that it was only necessary to produce evidence showing that the defendants were guilty of the same character of practices . . . and to make proof of the damages arising from such practices." 194 F.2d at 858-59.
 
 
 37
 There may be class actions where increased compensation is justified. A long and complicated trial would be an example. This was not the case here. Although the courts have a responsibility to award "fair and just allowances" to counsel, this must be done with full recognition of our position as a quasi-trustee of the fund to which the absent and unrepresented (except by the courts) claimants are entitled.
 
 
 38
 Insofar as the district court's comment that "the issues here were novel and complex" might be construed as a finding of fact, we hold that the record fails to support it and that within the purview of Fed.R.Civ.P. 52(a) it is clearly erroneous. If it is a conclusion of law, it is without factual foundation.
 
 
 39
 We reject appellee's argument that compensation should be generously granted for successful class action settlements in order to offset the costs of attorney time and effort expended on unsuccessful cases. We agree with the reasoning of Liebman v. J. W. Petersen Coal & Oil Co., supra :
 
 
 40
 "Several of plaintiffs' counsel have suggested that, because they have been involved in other class actions which were unsuccessful, they should be compensated in this action in an amount which would be in excess of normal or reasonable fees for their services in this case. This is an element of the argument that higher fees should be paid in class actions than normal to encourage counsel to bring them as private attorneys general.
 
 
 41
 We have considerable doubt about the justice of charging members of one class higher fees to compensate counsel for failing to recover for another class." 63 F.R.D. at 697.
 
 
 42
 As for the so-called "risk factor", appellee could not have been in suspense for any appreciable length of time. The complaints were filed in July, 1968; settlement negotiations commenced in early 1970. By the settlement date, August 27, 1971, virtually all risk had been eliminated. With the district court's approval of the settlement, in early 1972, any risk that the defendants might not hold to the negotiated terms vanished altogether. Moreover, while the decree which resulted from the Government's action against Grinnell may have had little effect on the instant class action, see Grinnell I, 495 F.2d at 455-56, the particular basis for the earlier decree would not alter the pertinent facts developed to such length in the Government action's massive record. Appellee, who had the benefit of access to the prior action's entire document repository, was definitely not "starting from scratch in this litigation". 1976-1 Trade Cases P 60,913 at 68,981.
 
 
 43
 The district court's determination of $125 as a "reasonable hourly rate" for Mr. Berger and $100 per hour for five others reflects a conceded high degree of skill. An award in such amount is not to be bestowed upon a lawyer representing a class simply on the basis of his having earned entrance into the legal profession. This should especially be avoided when such an amount becomes the foundation for superimposing fees of double and treble the "reasonable" amount, with the result becoming quite unreasonable.
 
 
 44
 Chief Judge Gardner said in Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., supra :
 
 
 45
 "We have carefully studied the entire record and briefs and can not escape the conclusion that the fees allowed to attorneys for plaintiff are excessive, and it is the duty of appellate courts to protect against 'vicarious generosity' in the matter of attorney fees." 194 F.2d at 859.
 
 
 46
 We have followed the same procedure and reach the same conclusion.
 
 III.
 
 47
 The district judge also reasoned that appellee is entitled to compensation from the fund for its efforts in preparing and supporting its fee application in the district court and on appeal. As support for this proposition, the court cited the district court opinion on remand in Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 382 F.Supp. 999, 1012 (E.D.Pa.1974). But the Third Circuit, in its en banc opinion in that case, has since repudiated the reasoning of the district court. Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 110-11 (3rd Cir. 1976) (en banc ) ("Lindy II "). That Court of Appeals has reaffirmed the principle that fees may be taxed against the class under the equitable fund theory only for services actually conferring a benefit on the class. As the Lindy II opinion explained,
 
 
 48
 "Services performed in connection with the fee application are necessary to the attorney's recovery. They benefit him, for without them, the attorney cannot . . . recover. But such services do not benefit the fund they do not create, increase, protect, or preserve it. . . . There being no benefit to the fund from services performed by appellees in connection with their fee application, there should be no attorneys' fee award from the fund for those services." 540 F.2d at 111.
 
 
 49
 Moreover, if counsel is allowed compensation for efforts to obtain his fee, any class member objecting to an initial award would risk increasing the total attorneys' fee and thereby decreasing the class's fund even though successful in pressing the objection.
 
 
 50
 Finally, although we are aware of decisions in this Circuit denying attorneys' fees for work evidenced only by "reconstructed" time records, e. g., In re Hudson & Manhattan Railroad Co., 339 F.2d 114 (2d Cir. 1964); In re Wal-Feld Co., 345 F.2d 676 (2d Cir. 1965), we concur in Judge Metzner's holding that "the hours allocated for the periods that were not covered by time records are fair and reasonable." 1976-1 Trade Cases P 60,913 at 68,981. In September, 1970, Messrs. Berger, Montague, and Newberg left the firm of Cohen, Shapiro, Berger, Polisher and Cohen to form their own firm. In setting up a new office there inevitably was some confusion which militated against the keeping of complete time records for each case handled. However, it is obvious that some work, of necessity, must have been performed on the Grinnell cases during this period. Lengthy affidavits submitted to the district court detailed how the time in fact expended was conservatively reconstructed by reference to pleading files, the time records of other attorneys, and other contemporaneous documents. Indeed, the careful reconstruction in this case contrasts sharply with the "almost entirely unsupported" estimates in In re Hudson & Manhattan Railroad Co., supra, at 115. Accordingly, we allow compensation for reconstructed time in this case.
 
 
 51
 We therefore affirm the "reasonable hourly rate for the attorneys who worked on this case" as found by Judge Metzner. 1976-1 Trade Cases P 60,913 at 68,982. We likewise approve an award of compensation for each of the categories of effort listed by the district court, except for that of "Fee Application". We reverse the allowance of any compensation for fee applications, original or appellate, and reverse the doubling and trebling of the categories so treated. In short, we hold that appellee should derive a total fee of $333,073.25, i. e. $352,765.75 minus $19,692.50, and direct that a judgment awarding such fee be entered.
 
 
 
 *
 Honorable Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation
 Mr. Justice Clark died on June 13, 1977, before this case could be decided. Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Moore and Mulligan, who are in agreement.
 
 
 [1]
 As used herein, the term "appellee" refers, either individually or collectively, to those lawyers of the firm David Berger, P.A
 
 
 [2]
 Appellants are not appealing the reimbursement of appellee for costs in connection with the employment of paraprofessionals and accountants
 
 
 [3]
 Paragraph 58 of the complaints alleged in part: "Such allegations (as had been brought by the Government) are similarly alleged in this complaint." App. at 43