**Anna LIEBMAN et al., Plaintiffs,**

v.

**J. W. PETERSEN COAL & OIL CO. et al., Defendants.**

**No. 71 C 1340.**

United States District Court,
N. D. Illinois, E. D.

April 5, 1974.

Robert S. Atkins, Robert F. Coleman, Freeman, Freeman & Atkins, Ltd., Chicago, Ill., for the State of Ill., and others.

Lowell E. Sachnoff, Joseph Gordon, Sachnoff, Schrager, Jones & Weaver, Ltd., Chicago, Ill., for Max Schorovitz, and others.

Perry Goldberg, Gig Specks, Jerome Wald and Joseph Cooper, Chicago, Ill., for 5120 Harper Building Corp., and others.

Aram Hartunian, Charles Pressman, Pressman & Hartunian, Chicago, Ill., for Anna Liebman and others.

William J. Harte, Kevin M. Forde and John J. Sullivan,* Chicago, Ill., for No. 2 Dwelling Assoc. and La Salle National u/T No. 11444.

Fred H. Bartlit, Don H. Reuben, Thomas A. Gottschalk, Michael W. Coffield, and Gerald E. Beatty, Kirkland & Ellis, Chicago, Ill., for J. W. Petersen Coal & Oil Co., F. D. Carpenter Coal Co., Mogg Coal & Oil Co., M. F. Hughes Coal & Oil Co., Hugh E. Petersen, William Harper, George R. Saunders, and Thomas J. Hughes, Jr.

Lewis W. Schlifkin, Schlifkin & Berman, Chicago, Ill., for Fidelity Coal Co., Oberheide Coal & Oil Co., Glendale Coal & Material Co., Polonia Coal Co., Samuel L. Nashban, Leonard Oberheide, Edward Dunne and Edward Pazdan.

Harvey J. Barnett, Rosenthal & Schanfield, Chicago, Ill., for Geo. Lill Coal Co., Rutter Coal & Oil Co., Lillco, Inc., and Owen Reebie.

Irwin I. Zatz, Arvey, Hodes & Mantynband, Chicago, Ill., for Roth Adam Fuel Co., O'Keefe Bros. Coal Co., Edward L. Dorr, Robert W. Roth, James O'Keefe, and Barry O'Keefe.

James P. Chapman, Chicago, Ill., for Carroll Coal Co., Samuel Bellows, Dan Dores, Jr., Dan Dores.

John H. Morrison, Kirkland & Ellis, Chicago, Ill., for Crerar Clinch Coal Co., Dunn Coal & Oil Co., Orvil Cochran.

John C. Tucker, Rodney D. Joslin, Jenner & Block, Chicago, Ill., for Marquette Coal & Mining Co., William W. Robson, Jr.

James S. Gordon, Chicago, Ill., for Hefter Coal & Oil Co., and Lester Hefter.

William P. Kearney, Kearney & Phelan, Chicago, Ill., for Hediger Corp.

Robert C. Hultquist, Moriarty, Rose & Hultquist, Chicago, Ill., for Royal Fuel Corp.

Edward LeVine, Wayne & LeVine, Chicago, Ill., for Silver Creek Coal Co., R. Gordon Hinners, Edward Kureld and Milton Kausal.

J. Alfred Moran and Lawrence S. Wick, Witwer, Moran & Burlage, Chicago, Ill., for Torch Fuel Co.

James B. Rice and George P. Latchford, Latchford, Rice & O'Brien, Chicago, Ill., for Bigane Coal Co.

Dean Dickie, Aaron, Aaron, Schimberg & Hess, Chicago, Ill., for Harold Stein Fuel Co.

Charles J. Gallagher, Cahill & Gallagher, Chicago, Ill., for Bell-Cusack Coal Co.

James R. Mitchell, Masuda, Funai, Eifert & Mitchell, Chicago, Ill., for Koegel Coal Co.

Louis E. Siciliano, Glenwood, Ill., for Stackhouse Coal Co.

Angelo Ruggiero, Chicago, Ill., for Lester Coal Co., Inc.

George R. Bieber and Howard L. Fink, Chicago, Ill., for Gould Coal & Oil Co.

Donald J. O'Brien, Jr., O'Brien, Kerpec & Evans, Chicago, Ill., for Chicago Coal Merchants Ass'n.

Edward V. Scoby, George E. Sweeney and Charles V. Kralovec, Kralovec, Sweeney, Marquard & Doyle, Chicago, Ill., for Joseph Sweeney and Joseph Lenz.

Henry T. Synek, Synek & Bishart, Chicago, Ill., for Henry Frerk & Sons.

* Mr. Sullivan was appointed a Justice of the Appellate Court of Illinois effective April 1, 1973, and has not appeared or participated in these cases since that date.

Sol A. Hoffman, David A. Saunders and Richard A. Friedlander, Hoffman & Davis, Chicago, Ill., for Diamond Coal & Oil Co.

## OPINION

WILL, District Judge.

### I. BACKGROUND FACTS

All of the cases here are in the process of settlement by virtue of the Court's approval of settlement agreements between the plaintiffs and substantially all of the defendants. The aggregate settlement will be approximately $2,300,000, of which $500,000 will consist of credits to be applied by defendants to current purchases of coal by members of the plaintiff class and the balance will be cash or its equivalent. All but one defendant having deposited the amount of its cash settlement payment, the stage is set for a distribution to class members. The only determination to be made prior thereto is the allowance of fees and expenses, the deduction of which will enable calculation of the per ton distribution to be made to class members.

While a detailed history of these cases is unnecessary, some background information is essential to an understanding of the court's conclusions. In 1969, the Antitrust Division of the Illinois Attorney General's office initiated an investigation of the trade practices of Chicago retail coal dealers. Over 100 witnesses and more than 750,000 documents were examined and eleven of the largest retail coal dealers in the Chicago area were indicted. The state criminal action was filed in June of 1971 and, shortly thereafter, several of the civil cases presently before the court were filed. Some few months later the Attorney General also filed a civil action, No. 71 C 2545, one of those here involved. His office made available to all plaintiffs all the material developed for the criminal trial. In addition, his staff took the initial responsibility for developing economic data on the coal industry and, in particular, information on the financial status of the defendants.

The state criminal action resulted in a directed acquittal on January 17, 1972, of all defendants. Until the state criminal action was concluded, discovery in the federal civil actions was understandably limited. After the conclusion of the state criminal action, counsel for the plaintiffs in 71 C 1348, the so-called *Harper Building* case, having previously obtained an order permitting all plaintiffs to inspect the documents produced by the defendants in response to *subpoenaes duces tecum* obtained by the Attorney General's office for use in the state action, obtained on April 21, 1972, an order from the Chief Judge of this court, requiring the Attorney General to produce what are known as the "Hughes tapes" and impounding them in the Clerk's office of this court. Considerable legal maneuvering followed in both the Federal and State courts as to the disposition to be made of the tapes which contained contemporaneous summaries reflecting one of the individual defendant's recollections as to what had been considered, discussed and decided at meetings of representatives of the principal defendants.

Meanwhile, counsel for the principal defendants opened discussions with the same plaintiffs' counsel and representatives of the Attorney General's office concerning a possible settlement with at least some of the defendants. These discussions continued through the summer of 1972. On September 25, a settlement of $1,000,000 in cash, plus $500,000 in purchase credits, was agreed upon subject to approval by the Court with the question of the amount and the source of payment of attorneys' fees left open for future determination by the Court.

The Attorney General personally presented the proposed settlement in open court on October 5, 1972, the first hearing on the cases after their transfer from the calendar of the late Judge Napoli to us. At that hearing, approval of the proposed settlement was urged by

the Attorney General and counsel for the plaintiffs in the *Harper Building* case, as well as by counsel for the principal defendants. Counsel for the plaintiffs in the other four private actions objected on the grounds that (1) the proposed settlement was premature since no determination of the appropriate class or classes of plaintiffs had been made with the result that there was no way of knowing the identity or number of the class members; (2) substantial discovery with respect to the issues of liability, damages and the financial condition of the defendants was necessary; and (3) objecting counsel had not participated in the settlement negotiations.

We concluded that consideration of the fairness of the settlement was premature. Accordingly, we ordered that the plaintiff class or classes be determined, the appropriate notices be sent to the prospective members, and discovery be conducted on the issues of liability and damages, as well as with respect to the financial condition of the defendants since it was urged that the proposed settlement was the maximum which they could afford to pay. To insure coordination of the pretrial activities and minimize any further suggestion of divided action by counsel for the plaintiffs in the various cases, we designated co-lead counsel for the plaintiff class or classes, naming a representative of the Attorney General and one of the counsel who had objected to consideration of the initial settlement proposal.

Thereafter, notices were sent to all potential class members, a number of depositions were taken, interrogatories were served and answered, documents were obtained and examined with respect to the defendants' financial conditions, and an economic expert was retained. In March 1973, preliminary hearings were held on the proposed settlement and on May 29, we filed an opinion and order declining to authorize sending the proposed settlement to the class members. That opinion spelled out

in detail the reasons for our action and they need not be repeated here.

In June, the defendants filed a motion for reconsideration of our ruling which we denied on June 29. The defendants, and some plaintiffs, then sought to appeal our decision and private co-lead counsel moved to dismiss the appeals on the ground that they were improper because the order was not a final one. A record was prepared and briefs were filed but the appeals were subsequently dismissed by the appellants when a new settlement proposal was negotiated.

During the summer of 1973, co-lead counsel negotiated with counsel for the principal defendants concerning a possible settlement which would satisfy the criteria enunciated in our opinion of May 29. As a result, an augmented settlement proposal was presented to the court for preliminary consideration. On October 1, 1973, we authorized its submission to members of the class and set a final hearing on the fairness of the proposed settlement for November 9, 1973.

At that hearing, a large number of class members appeared in person and the proposed settlement was summarized for them by Mr. Sachnoff, private co-lead counsel. Members of the class asked a number of pertinent questions concerning the settlement, including an inquiry as to why it was necessary to compensate private counsel in view of the fact that the Attorney General's office was representing the class. After a full hearing, the court approved the settlement which involved defendants whose sales constituted 82 per cent of the total relevant sales by all defendants in the years involved. The approved settlement called for a payment of $1,339,000 in cash, plus $500,000 in credits, with the specific provision that attorneys' fees as allowed by the court were to be paid from the cash fund.

As well as the additional cash payment of $339,000, the augmented settlement proposal provided for payment in

50 days after approval rather than over a period of nine months, and it included a waiver of any constitutional objections to the use of the "Hughes tapes" and other important evidence. Since it was contemplated that the actions against the non-settling defendants would be tried, the availability of the tapes and other evidence was an important element of the settlement.

As a result, in part, of the additional available evidence, plus the fact that under the antitrust laws the remaining defendants would be potentially jointly and severally liable for the total treble damages which might be awarded, less the amount of the settlement, virtually all of the remaining defendants indicated a desire to settle their cases. Over the next several months, the original non-settling defendants negotiated with both co-lead counsel and settlements were approved which resulted in an aggregate of $476,000 in cash being added to the settlement fund. This amount, it should be noted, represents a larger proportionate cash payment from the original non-settling defendants than the combined cash and credits contributed by the original settling defendants.

The foregoing capsule summary of the history of these cases inevitably fails to reflect the time and effort devoted by the office of the Attorney General and the various private counsel to the disposition of the cases. There is no possible way the court in a written opinion can set down the hearings, conferences, motions, briefs, correspondence, memoranda, research, etc., necessarily involved. Our failure to attempt to do so represents no derogation of the magnitude of the efforts of all concerned. On the contrary, we are well aware of the volume and, in some instances, the complexity of the necessary activities.

A few further general factual observations are necessary before we consider the applications of the various private counsel. This case is somewhat unique because of the substantial role played by the Office of the Illinois Attorney General, William J. Scott. From the commencement of the criminal investigations in 1969 to the settlement of the civil cases, fourteen members of his staff, eight of them attorneys and the others either investigators or para-legals, were in some degree involved. Two of them, Robert S. Atkins and Robert F. Coleman, participated in virtually every phase of the development and settlement of the cases, and Atkins was designated by us as one of the two co-lead counsel for the plaintiff class.

The early settlement negotiations were conducted primarily by counsel for the plaintiffs in the *Harper Building* case, Messrs. Goldberg, Specks and Wald, in conjunction with Messrs. Coleman and Atkins. As a result of these negotiations, the principal defendants were induced to raise an initial settlement offer of $250,000 through stages to the proposed settlement of $1,000,000 in cash and $500,000 in credits which we found to be premature and, after a preliminary hearing, to be so substantially below the minimum possible single damages as to fall outside the parameter of a reasonable settlement in light of the probabilities of liability and the financial condition of the defendants.

Thereafter, necessary discovery was conducted by counsel for the plaintiffs in the other cases under the leadership of Lowell E. Sachnoff whom we had designated as the private co-lead counsel. Representatives of the Attorney General's office participated in the discovery and in the subsequent settlement negotiations which resulted in the addition of $339,000 in cash to the final settlement.

After the hearings on the augmented settlement proposal and the text of the notice to be sent to the class members, during the course of which the court indicated a probable ceiling of $150,000 on the fees to be allowed private counsel in conjunction with their services up to that date, leadership in the settlement negotiations with the original non-settling defendants, and in developing the

procedures and mechanics for handling the collection and distribution of the settlement fund was assumed by the Attorney General's office although private co-lead counsel and other private counsel cooperated therein. These subsequent negotiations resulted in an additional amount of $476,000 in cash being added to the settlement fund.

Finally, the fact that five separate private actions were filed in addition to the civil suit instituted by the Attorney General necessarily resulted in a duplication of all of the legal work involved in the preparation, drafting and filing of the pleadings, court appearances, notices, motions, briefs, conferences, etc. Until the appointment of co-lead counsel and the delegation to them of responsibility for the orderly management of the class claim involved in all of the actions, there was inevitably a great deal of inefficiency, waste, duplication, and even competition in the representation of the plaintiff class. Even thereafter, the number of counsel and the history of the cases resulted in much time and effort being devoted by counsel which was either unproductive or even counter-productive. The time, for example, devoted to the aborted appeal from the court's refusal to permit the settlement proposal initially presented to it to be submitted to the class members was necessary but contributed little benefit to the members of the class.

Similarly, the effort involved in the dual negotiations concerning a settlement agreement with the principal defendants was probably inevitable given the delay in the designation of lead counsel although it also resulted in part from the independent action of some plaintiffs' counsel without consultation with or notice to the court, and without the participation, and over the objection of other plaintiffs' counsel. Again, the benefit to the members of the plaintiff class was disproportionate to the time spent.

## II. CRITERIA FOR DETERMINING REASONABLE FEES

The criteria to be applied in determining what represents reasonable fees in class actions are still in the process of evolution and clarification. Many of the courts considering the question have found the amount of the recovery to be the primary criterion and have awarded fees ranging up to 30 per cent of that amount. See, e. g., Epstein v. Weiss, 50 F.R.D. 387 (E.D.La.1970); CCH Fed. Sec.L.Rep. ¶ 92,928; Newmark v. RKO General, Inc., 332 F.Supp. 161 (S.D.N.Y.1971); Feder v. Harrington, 58 F.R. D. 171 (S.D.N.Y.1972), CCH Fed.Sec.L. Rep. ¶ 93,689; Newman v. Stein, 58 F. R.D. 540 (S.D.N.Y.1973); CCH Fed. Sec.L.Rep. ¶ 93,780.

The Court of Appeals for the Third Circuit, in a recent opinion, has presented a comprehensive analysis of the basis for the awarding of fees to counsel in a class antitrust action and the standards governing fee awards. Lindy Bros. Builders, Inc. of Phila. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161 (3rd Cir. 1973).

In discussing the applicable standards, the court first pointed out that the trial judge is empowered to exercise his informed discretion in the fixing of reasonable fees and his determination may be challenged only by showing that he abused that discretion. The court then went on to discuss the standards which a trial judge should apply, pointing out that the purpose of an award of fees was to compensate the attorneys for the reasonable value of services benefitting the class.

The first inquiry, the opinion states, should be into the hours spent by the attorneys and for what purpose. Specifically, the court held, p. 167, *supra*:

> It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney. But without some fairly definite information as to the

hours devoted to various general activities, e. g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e. g., senior partners, junior partners, associates, the court cannot know the nature of the services for which compensation is sought.

After determining the services performed, the court held the district judge must determine their value. The starting point in such a determination, the court said, is to fix a reasonable hourly rate for each attorney's time, taking into account his legal reputation and status as partner or associate. Where several attorneys file a joint petition for fees, different rates may be appropriate for different attorneys and the reasonable rate of compensation may also vary for different activities.

 Finding the reasonable hourly rate does not end the necessary inquiry before a reasonable fee can be determined, although, the court observed, this should be the "lodestar" of the trial court's fee determination. At least two other factors should be taken into account. One is the contingent nature of success. A consideration here "may be the progress of any criminal action brought against the defendants." *Supra* at 168.

The second additional factor is the extent, if any, which the quality of the attorney's work mandates increasing or decreasing his compensation. Inherent in such an evaluation are the complexity and novelty of the issues presented, the quality of the work that the judge has been able to observe and, of course, the amount of the recovery obtained. If the reasonable compensation is increased or decreased as a result of these considerations, the court held that the district judge should set forth as specifically as possible the facts that support his conclusion.

The Manual for Complex Litigation also contains some suggested standards to be applied in fixing reasonable compensation in class actions and expresses some caveats with respect to the standards utilized in some of the decided cases. It points out that, in addition to the usual criteria for the determination of reasonable attorneys' fees as set forth in the ABA Code of Professional Responsibility, there are three additional factors present in class actions:

. . . (1) that in seeking and accepting employment as counsel for a judicially determined class an element of public service is involved; (2) the representation of the class by counsel is not a result of private enterprise but results from provision of an opportunity to represent the class by a judicial determination; and (3) the policy of the law in class actions, including antitrust actions, is to provide a motive to private counsel to represent consumers and to enforce the laws. Manual for Complex Litigation, p. 50.

## III. THE REASONABLE FEES FOR COUNSEL HEREIN

We come then to the determination of reasonable fees for all counsel herein. While the Attorney General has indicated that he desires any fees which might be awarded to his office for its services to be distributed to the class members, it is necessary to determine the amount thereof before they can be added to the distribution fund. Moreover, such a determination is necessary to calculate the aggregate fees reasonably allowable to all counsel who participated in these cases.

A. The Attorney General's Office

As previously indicated, the genesis of these cases is the investigation commenced by the Attorney General of Illinois in 1969. Since none of the civil actions was filed until after indictments in the State criminal proceedings had been returned, it is not surprising that the estimate of the total hours devoted by members of his staff to these cases[1] ex-

---

1. Unfortunately, the staff of the Attorney General's office does not maintain daily time records with the result that we must deal with what they insist are "conservative esti-

ceeds those of the other two groups of counsel who have filed fee applications.[2] It is also not unreasonable to conclude that the private civil actions would probably never have been instituted had the Attorney General's office not conducted its investigation and brought its criminal suit.

From October 1969 through apparently mid-September of 1973, excluding the 14 weeks consumed in presenting the State's case in the criminal trial at the conclusion of which the trial judge directed a verdict for the defendants, the staff of the Attorney General purportedly devoted an estimated 4,600 hours to the development and settlement of the civil actions. Of that total, approximately 2,350 hours were those of attorneys, primarily Messrs. Coleman and Atkins. Their activities included the development of the criminal case involving interviewing over 100 prospective witnesses and examining more than 750,000 documents, preparation of grand jury *subpoenaes duces tecum* and *ad testificandum*, interrogating 104 witnesses before the grand jury, abstracting some 8,000 pages of grand jury transcripts, and preparing the Bill of Particulars and Voluntary Statement filed by the State in the criminal case which contained much of the information essential to the plaintiffs' liability case in the civil actions. The attorneys' time devoted to the foregoing amounted to some 1,400 hours. In addition, an investigator who was also a certified public accountant, spent an estimated 1,620 hours in interviews, review and analysis of documents and preparation of summaries and charts with respect thereto. Two paralegals spent an estimated 500 hours in numbering, categorizing and indexing the more than 750,000 documents secured in preparation of the criminal case. Much of the foregoing was done prior to the filing of the first of the civil actions, and the resulting information

and material was made available to plaintiffs' counsel in their actions. As a result, a great deal of the potential evidence on the issues of liability and damages was in hand at the time the civil suits were filed.

Although none of the 14 weeks of criminal trial time has been included in the Attorney General's statement of time allocable to these cases, there is no doubt that the evidence presented by the state at that trial was valuable to the plaintiffs in the civil suits and may well have influenced the defendants in their decision to seek possible settlement of those actions.

Between the filing of the state's civil case in October of 1971 and September of 1973, when we authorized submission of the argumented settlement proposal to members of the class, attorneys on the Attorney General's staff, again primarily Messrs. Coleman and Atkins, devoted an estimated 550 hours directly to the civil actions. Their activity included abstraction and indexing of the trial transcript in the criminal case drafting the State's original and amended civil complaints, attendance at pretrial conferences and hearings, conferences with counsel for the defendants and other plaintiffs' counsel, and drafting and reviewing various documents concerning the initial and augmented settlement proposals, drafting the notice to members of the class ordered by the court at the October 1972 hearing, working out the mechanics of mailing and publishing the same and conferences in connection therewith, preparation of notices, preparation for and attendance at depositions both in St. Louis and Chicago, and conferences with other plaintiffs' counsel in connection therewith, compiling a summary of the interrogatories submitted by various counsel for defendants, and necessary legal research in connection with all of the foregoing.

mates." Given the nature of the activities involved and the time charges of other counsel, this characterization does not appear to be inaccurate.

2. The two groups are Messrs. Goldberg, Specks and Wald (Goldberg group) and all other plaintiffs' counsel (Sachnoff group).

As previously indicated, substantial controversy developed over the disclosure of the substance of the so-called "Hughes tapes." These tapes, containing defendant Hughes' dictation to his secretary as to what had taken place during meetings of the principal individual defendants, were obtained by the state in the course of its investigation. Defendants sought to have them suppressed and there followed a series of legal maneuvers which carried to the Illinois Supreme Court, as well as into this court. In the course of those proceedings, attorneys on the Attorney General's staff, including James Thompson, Joel Flaum, Morton Friedman, Kenneth Mannister, and Messrs. Coleman and Atkins, devoted an estimated 400 hours to court appearance, preparation of briefs, legal research, conferences, etc. before, as part of the augmented settlement proposal, any objection to the tapes' use was waived.

Finally, in addition to the foregoing, three investigators on the Attorney General's staff other than Mr. Foley, spent an estimated 125 hours interviewing possible witnesses.

The foregoing covers the period prior to the approval of the submission of the augmented settlement offer to members of the class. As previously noted, after the preliminary hearing on the augmented settlement proposal, Mr. Coleman of the Attorney General's office assumed primary responsibility for (1) setting up the procedure and arrangements for processing the claims of class members, collecting the various settling defendants' cash contributions, establishing an escrow fund and directing its investment, and participating in the day-to-day administrative activities related thereto; (2) conducting settlement negotiations with the initial non-settling defendants, particularly Crerar Clinch Coal Co., Diamond Coal Co., Lester Coal Co., Gould Coal Co., and Dunn Coal Co.; and (3) preparing for the possible trial of the cases of any non-settling defendants.

The foregoing activities involved conferences, review of various documents, court appearances, preparation of notices and motions, depositions, legal research, etc. It is estimated that Mr. Coleman and Mr. Atkins who participated in the preparation of the Crerar Clinch case for trial, but principally Mr. Coleman, devoted a minimum of 265 hours to these cases from mid-September 1973 through February 1974. In addition, the Attorney General's office provided space and support for the clerical staff which, under Mr. Coleman's supervision, processed the some 8,000 claims filed by class members.

Based on their estimates, the office of the Attorney General devoted some 2,615 hours of attorneys' time and a minimum of 2,245 hours of accountants', investigators' and para-legal time to the development, settlement and disposition of these cases. Private counsel have questioned the inclusion of the time involved in securing the evidence which was used in the criminal trial and would have been used in the trial of the civil actions had they not been settled. While it is true that the evidence was not obtained initially for the civil cases, it certainly would have been necessary to obtain it before those cases could have been tried. Moreover, as previously observed, the possibility of settlement was undoubtedly greatly enhanced by the availability of the information and the transcript of the criminal trial. Inasmuch as none of the fourteen weeks devoted to the criminal trial has been included in the Attorney General's time allocations and since the information was equally valuable to the plaintiffs in the civil actions, we conclude that allocating half of the 1,400 hours of attorneys' time and half of the 1,745 hours of investigator-accountants' and the 500 hours of para-legals' time to these actions is eminently reasonable.

Accordingly, we find that attorneys attached to the Attorney General's office spent not less than 1,915 hours on these cases, that accountant-investigators spent 872½ hours, and para-legals 250

hours on them. Of the 1,915 hours of attorneys' time, 150 hours were devoted to the initial settlement negotiations which we found to be premature and, as a result, further negotiations were required after the class had been defined and necessary discovery accomplished. We conclude that 100 hours is a reasonable allocation to the useful aspects of these early negotiations and, therefore, reduce the total of attorneys' time to 1,865 hours.

There remain the determinations of reasonable hourly rates and whether those rates should be increased or diminished to reflect other relevant factors.

■ Messrs. Atkins and Coleman, whose time represents almost all of the 1,865 hours of attorneys' time devoted by the Attorney General's office, are not nationally known antitrust or class-action experts. They are, however, lawyers of considerable competence and their work in the civil actions, as observed by the court, was excellent. Primarily, it was out of court, although a substantial number of court appearances necessarily were involved, as well as participation in a number of depositions. We conclude that an hourly rate of $60 for all of their work is very reasonable. In view of the relatively small amount of time involving more prestigious members of the Attorney General's staff such as Messrs. Thompson, Flaum and Friedman, we will apply that rate across the board. Accordingly, we conclude that $111,900 represents a fair and reasonable allowance to the Attorney General's office for legal fees.

So far as any adjustment in that allowance to reflect contingency, complexity, or the amount recovered is concerned, we conclude that none is warranted. Obviously, there was no contingency so far as the Attorney General's office was concerned. The matters were no more or less complex than those normally involved in antitrust litigation and we do not believe the amount recovered was so large or so small as to require an adjustment on that basis.

■■ There remains only the question of what amount, if any, should be allowed to the Attorney General's office for the services of the accountant-investigators and para-legals who participated in the development of the evidence. The use of non-lawyers to assist attorneys in the preparation of cases is generally recognized as desirable and compensation for their services has been deemed appropriate. See, e. g., City of Detroit v. Grinnell Corp., 356 F.Supp. 1380 (S.D.N.Y.1972). We find that an allowance of $25 per hour for the former group, almost all of the time of which is that of Mr. Foley, who was also a CPA, and $10 per hour for the para-legals, is reasonable. Having previously reduced the number of their total hours by 50 per cent to reflect their contribution to the civil cases, no further adjustment is necessary. The reasonable allowance for the accountant-investigators is, therefore, $21,812.50, and for the para-legals is $2,500.00. The aggregate allowable to the Attorney General of Illinois is, accordingly, $136,212.50.

B. The Goldberg Group

This group consists, as we have previously indicated, of Messrs. Goldberg, Granvil I Specks and Jerome S. Wald. They have petitioned to be allowed $150,000 in counsel fees, plus $506.87 in out-of-pocket disbursements. They are the counsel in the so-called *Harper Building* case, one of the five private actions, and were active initially in the early discovery efforts including the Hughes tapes maneuvers and the early settlement negotiations.

In support of their petition, they have submitted affidavits averring that, prior to November 1, 1973, they devoted the following hours to these cases.

Mr. Goldberg—277¾ hours of which 58½ hours involved settlement negotiations in connection with the initial settlement proposal which we found to be inadequate.

Mr. Specks—81¾ hours of which 33 hours involved similar settlement negotiations.

Mr. Wald—164¼ hours of which 14½ hours involved research and drafting of the groups' memoranda in support of its fee petition.

Mr. Josef D. Cooper—Mr. Goldberg avers that his former partner devoted 73¼ hours to the cases.

The group has submitted no supplemental statement of time since November 1, 1973, and while the Court is aware that Mr. Goldberg has made several court appearances since that date, we are also aware that the group has had little participation in the preparations for trial and the settlement negotiations with the initial non-settling defendants. We are also cognizant of the fact that the foregoing hours include time spent in the aborted appeal from the Court's order of May 23, 1973, declining to authorize submission of the initial settlement proposal to the class members.

Unfortunately, the time statements of the group are vague and general. For example, Mr. Goldberg reports "Preparation of court papers relating to other matters, inter-office conferences, etc." Mr. Wald shows 43½ hours devoted to "Conferences with various counsel of record, and with co-counsel." These are but examples, for most of the time charges reflected in the affidavits are so vague as to be difficult, if not impossible of evaluation as to their contribution to the ultimate disposition of these cases.

It is apparent from the memorandum presented in support of the petition that the Goldberg group is not seriously relying on the hours devoted as the "lodestar" of its fee request. Rather, the memorandum stresses the role played by the group, particularly Mr. Goldberg, in the initial settlement discussions which resulted in the $1,000,000 cash plus $500,000 credits proposal.

The group urges that securing such an offer justifies allowance of the $150,000 fee they seek regardless of the time involved. Other plaintiffs' counsel disagree and characterize the proposal as a "cheap" settlement which could have been secured by anyone and one which assumed the dire financial condition of the defendants without any discovery to ascertain the true facts.

While we found the proposed settlement to be premature and inadequate, we believe the Goldberg group made a contribution to the ultimate result by seeking early discovery, including the disclosure of the substance of the Hughes tapes, and conducting preliminary negotiations which revealed a serious settlement interest on the part of most of the defendants. Their effort to negotiate and obtain approval of a settlement before the class determination had been made and before either lead counsel had been designated or the court informed of their activities was, at best, unfortunate, and has exposed them to the suggestion that they were primarily interested in an early, easy settlement and fee whether or not such a settlement was in the best interests of the class.

It is obvious, of course, that had the class designation and appointment of lead counsel been made earlier, much of the maneuvering and internal controversy would, in all probability, have been avoided. It should be noted, in this connection, that counsel did not press the court for either the class determination or the designation of lead counsel but were quite content to maneuver independently as best they could.

Notwithstanding the ambiguity of counsels' time statements, the challenge to the utility to the class of their early settlement efforts and the aborted appeal from our May 23, 1973 ruling, we are disposed to accept most of their statements of hours devoted to the cases. The total hours of all members of the Goldberg group, as set forth in their affidavits, is 597. Since they have devoted some time to the cases since last fall, for which no request or documentation has been submitted, we will assume that the 597 hours is reasonable for their total contribution.

We come then to the determination of normal hourly rates for those

services. Messrs. Goldberg, Specks and Wald are experienced and well-known practitioners in the antitrust and class action field. Judge Bauer, of this court, recently had occasion to consider what would be a normal hourly charge for their services and determined that $100 per hour in the cases of Messrs. Goldberg and Specks, $75 per hour in the case of Mr. Wald, and $50 per hour for Mr. Cooper, was normal. Based on the information submitted to us, some of these normal hourly rates appear somewhat generous. Mr. Sachnoff, who is also a nationally recognized expert in antitrust and class actions, has submitted a schedule of his firm's normal hourly billing rates. That schedule discloses that he normally charges $75 per hour for office and $85 per hour for court work in litigation, including antitrust, and class actions. In addition, the Sachnoff group conducted a survey of most of the firms participating in these cases, including a number of the largest and best known Chicago firms, a summary of which we include in this opinion.

[A99992]

### Fees Charged by Law Firms Representing the Parties
Based upon Three Categories: Senior Trial Partner, Middle Trial Partners, and Associates with Two Years Experience

Senior Trial Partner = ✳

Middle Trial Partner = ▲

Assoc. w/2 years experience = ○

### Law Firms Represented in Survey

Arvey, Hodes & Mantynband
Aaron, Aaron, Schimberg & Hess
Bell, Boyd, Lloyd, Haddad & Burns
Sidley & Austin
Hoffman & Davis
Jenner & Block
Kirkland & Ellis
Lord, Bissell & Brook
Schwartz, Cooper, Kolb & Gaynor
James P. Chapman

Pressman & Hartunian
Sachnoff, Schrager, Jones & Weaver
Schwartz & Freeman (Howard Fink)
Mayer, Brown & Platt
Rosenthal & Schanfield
Schlifkin & Berman
John J. Sullivan
William Harte
Kevin Forde

### Average Rate Charged by Each Category

| | |
|---|---|
| Senior Trial Partner | = $85 |
| Middle Trial Partner | = $62 |
| Assoc. w/2 yrs. exp. | = $41 |

That survey discloses an average normal hourly charge of $85 for senior trial partners, $62 for middle trial partners and $41 for associates with two years experience. Only five firms charge more than $85 per hour for the time of senior trial partners (1—$125, 4—$100), fourteen charge $85 per hour or less (3—$85, 1—$80, 6—$75, 2—$70) and (2—$65). No evidence has been presented to us substantiating a $100 per hour rate for any of plaintiffs' counsel except Judge Bauer's findings which were apparently based on evidence other than that made available to us. Given the record here, we find that $90 per hour is a fair normal hourly charge for Messrs. Goldberg and Specks, $75 per hour for Mr. Wald and $50 per hour for Mr. Cooper. Applying those normal hourly rates to the time statements of the Goldberg group, we find that $48,-336.25 represents the aggregate normal hourly charges of the group for the time devoted to these cases.

Again we must determine whether the normal hourly charges should be adjusted upward or downward in the light of other relevant considerations. The Goldberg group has vigorously contended that their fees should not be predicated on hourly charges but should be based on their having negotiated the initial settlement offer. We have already discussed that contention and rejected it.

They also urge that substantially higher than normal hourly charges should be allowed in view of the contingency factor and to encourage private attorneys general to initiate such actions. No contention is made that their activities involved unusually complex legal or factual issues.

With respect to the contingency and private attorneys general inducement issues as they relate to these cases, several observations are pertinent. The first is that the element of contingency was not substantial. Before the civil actions were filed, the State had accumulated substantial evidence against the defendants and had indicted them. Based primarily

on that evidence and the transcript of the criminal trial, all plaintiffs' counsel stated to us at their initial appearance after the cases had been transferred to our calendar that they had every confidence liability would be demonstrated if the cases went to trial. These representations were made after the criminal trial had ended in defendants' favor. While defendants never conceded liability, they instigated settlement discussions shortly after the criminal action was concluded. It is difficult to find any substantial element of contingency under the circumstances.

Several of plaintiffs' counsel have suggested that, because they have been involved in other class actions which were unsuccessful, they should be compensated in this action in an amount which would be in excess of normal or reasonable fees for their services in this case. This is an element of the argument that higher fees should be paid in class actions than normal to encourage counsel to bring them as private attorneys general.

We have considerable doubt about the justice of charging members of one class higher fees to compensate counsel for failing to recover for another class. We recognize, however, the desirability of encouraging the institution of actions seeking to vindicate the rights of members of a class who are unlikely or unable to do so individually. But we do not believe this should, or, in the light of an awakening sense of public service responsibility on the part of the bar, does in fact require the magnitude of financial reward which has been bestowed by some courts on successful plaintiffs' counsel.

In any event, this is not a case where, absent private counsel, the class members would in all probability have gone unrepresented and their grievances unredressed. The Attorney General of Illinois has been ready, willing and able to represent them and has, in fact, done so. The five private class actions all were filed after his office returned criminal

indictments against the defendants and were undoubtedly stimulated by his action. The state's civil action has been on file since October 1971. While private counsel have undoubtedly made a substantial contribution to the ultimate disposition of these cases, they were hardly indispensable and certainly not a platoon of them. For lawyers who profess to be in such demand by regular clients at normal hourly fee rates that higher than normal fees are necessary to induce them to make their talents available as private attorneys general, they exhibited great enthusiasm and aggressive competition with each other to participate in these cases notwithstanding the presence of a public attorney general.

We do not derogate their interest or their contribution which, as indicated, was substantial, but we are not disposed to compensate them at more than normal hourly rates for their services. We conclude then that the Goldberg group are entitled to aggregate fees of $48,336.25 and reimbursement of $506.87.

## C. The Sachnoff Group

The final group of counsel seeking compensation consists of the attorneys in the four private suits who opposed the initial proposed settlement and include: Lowell Sachnoff, whom we designated as co-lead counsel with Mr. Atkins; Aram Hartunian, counsel for plaintiffs in the first civil action filed; William J. Harte and John J. Sullivan, counsel in the so-called Chicago Dwellings Association case; and Kevin Forde, who was counsel with Mr. Harte in the remaining case. They initially requested $243,000 in fees, plus $9,655.75 in costs and expenses, including an expert's fee of $3,200.00.

We have previously pointed out that this group began taking an active role in the cases in the fall of 1972 when the initial proposed settlement was presented to the court and Mr. Sachnoff was des-

ignated co-lead counsel. Their relative participation diminished somewhat after the court's preliminary approval of the augmented settlement proposal in the fall of 1973 during the course of which we expressed the tentative opinion that the aggregate fees of all private counsel for their services in effecting a settlement fund of $1,339,000 in cash, plus the $500,000 in credits, should not exceed $150,000, in view of the contribution of the Attorney General's office and the time devoted to the cases by private counsel. They did, however, continue to devote time and effort to the preparations for the possible trial of the non-settling defendants and the settlement negotiations with these defendants although, as previously discussed, Mr. Coleman of the Attorney General's staff assumed primary responsibility for all of these activities.

In their initial request for fees, the members of the Sachnoff group averred that they had devoted the following hours to the cases up to September 1, 1973, and that their normal hourly charges were as indicated:

1. Members and associates of the Sachnoff firm:

| | Hours | Rate |
|---|---|---|
| Lowell E. Sachnoff | 397 | $85–95 |
| Leonard J. Schrager | 9 | 75 |
| Joseph Gordon | 461 | 75–85 |
| Franklin G. Allen | 6 | 75 |
| Stephen M. Merrick | 2 | 65 |
| Herbert Beigel | 18 | 35–50 |
| Robert D. Evans | 33 | 35–50 |
| Robert L. Greenwald | 6 | 35–50 |
| Charles H. Perlman | 2 | 35–50 |
| Austin L. Hirsch | 4 | 35–50 |
| Ellis B. Rosenzweig | 12 | 35–50 |

2. Co-counsel in two of the cases:

| | Hours | Rate |
|---|---|---|
| John J. Sullivan | 57½ | 100 |
| William J. Harte | 177½ | 75 |
| Kevin M. Forde | 189 | 50 |

3. Counsel in the Liebman case:

| | Hours | Rate |
|---|---|---|
| Aram Hartunian ⎱ Charles Pressman ⎰ | 311 | 75–85 |

In a supplemental request covering the period subsequent to September 1, 1973, the members of the Sachnoff

group aver that they have devoted substantial additional time to the ultimate disposition of these cases. Unfortunately, they have not furnished the Court with the same breakdown as between the members and associates of the Sachnoff firm as they did in their initial application. While they aver that the total firm time was 367½ hours, the aggregate of the hours identified as devoted to specific activities totals only 274 hours of attorneys' time and 20 hours of para-legal time.

Messrs. Harte and Forde aver that from September 14, 1973 through February 15, 1974, Mr. Harte spent 36 hours and Mr. Forde 35 hours on the cases. Finally, Mr. Hartunian avers that he spent an additional 32¼ hours on the cases during this period. The group also requests additional reimbursement of $2,675.10 for out-of-pocket disbursements.

While, as previously discussed, the failure to make an early determination of the class or classes and early designation of lead counsel resulted in some duplication of the activities of the Attorney General's staff, the Goldberg group and the Sachnoff group, we are neither disposed nor able to impute responsibility therefor to any particular counsel. With respect to the period prior to September 1973, therefore, we will accept the hours submitted by the Sachnoff group. In view of the fact that during the period subsequent to September 1973 Mr. Coleman was primarily responsible for all activities, we have considerable difficulty in understanding how the Sachnoff group could have devoted an aggregate of either 377¼, or, taking the Sachnoff firm's higher figure, 470¾ hours, when the total hours of the Attorney General's office was only 265, unless a great deal of duplication was involved. An examination of the information submitted by members of the group indicates that this apparently was the case. Mr. Hartunian, for example, shows 15 hours devoted to talking to Messrs. Sachnoff and Gordon. All of the members of the group show substantial time charged to the pursuit of Mr. Hughes, the only settling defendant who has failed to deposit his allocable share of the settlement.

We cannot in good conscience recognize more hours to the Sachnoff group than were devoted to these cases by the Attorney General's office during this period. Accordingly, we will pro-rate the time charges of the attorneys in the Sachnoff group and allocate an aggregate of 240 hours divided as follows:

| 1. | Sachnoff firm | 175 |
| 2. | Mr. Harte | 23 |
| 3. | Mr. Forde | 22 |
| 4. | Mr. Hartunian | 20 |

In addition, we will allow the 20 hours of para-legal time.

There is a further ambiguity with respect to the time statements of the Sachnoff firm subsequent to September 1973. As indicated, they contain no allocation of time between partners and associates. We are aware that Mr. Gordon was the most active member of that firm but that Mr. Sachnoff also participated. Absent more detailed information, we will divide the firm's time two-thirds to Mr. Gordon and one-third to Mr. Sachnoff.

This brings us to the question of normal hourly charges. We have already delineated the evidence before us on the charges normally made by the various attorneys in the Sachnoff group. There is some variation between the normal hourly charges reflected in the schedule of Attorney Billing Rates submitted by the Sachnoff firm and Mr. Sachnoff's affidavit. For example, the schedule re-

flects a $75–85 top hourly range for his services while his affidavit avers that his normal hourly charge for litigation is $85–95. Mr. Gordon is shown on the schedule to charge $65 for office and $75 for court work in litigation matters while Mr. Sachnoff's affidavit reflects a $75–85 hourly range. Since Mr. Sachnoff devoted over 400 hours and Mr. Gordon more than 500 hours to these cases, this discrepancy is not insignificant.

## ATTORNEY BILLING RATES

| | L E S | L J S | R C J | W N W | F G A | J G | G L F | J C R | P P R | E J W | C H P | S M M | R L G. | H A N | H B | A L H | E B R | N H D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. General Corp. & Business | 70 | 60 | 60 | 60 | 55 | 60 | 55 | 55 | 50 | 50 | 45 | 55 | 35 | 35 | 35 | 40 | 35 | 50 |
| 2. Estate Planning | 60 | 70 | 60 | 60 | 55 | 60 | 55 | 55 | ·50 | 50 | 40 | 55 | 40 | 35 | 35 | 35 | 35 | 50 |
| 3. Litigation—Court | 85 | 75 | 70 | 75 | 75 | 75 | 60 | 60 | 55 | 50 | 40 | 70 | 40 | 35 | 35 | 60 | 35 | 60 |
| 4. Litigation—Office | 75 | 60 | 60 | 60 | 55 | 65 | 55 | 55 | 50 | 50 | 40 | 60 | 35 | 35 | 35 | 50 | 35 | 50 |
| 5. Securities (also see #10) | 80 | 60 | 60 | 70 | 60 | 60 | 65 | 55 | 50 | 50 | 50 | 60 | 35 | 35 | 35 | 35 | 35 | 60 |
| 6. Taxation | 60 | 70 | 60 | 60 | 55 | 60 | 55 | 65 | 50 | 50 | 40 | 55 | 40 | 35 | 35 | 35 | 40 | 50 |
| 7. Real Estate | 60 | 60 | 70 | 60 | 60 | 60 | 55 | 55 | 55 | 55 | 40 | 55 | 40 | 35 | 35 | 35 | 35 | 55 |
| 8. Special Corp. & Business | 85 | 75 | 75 | 75 | 65 | 70 | 65 | 65 | 60 | 55 | 50 | 60 | 40· | 40 | 35 | 45 | 35 | 60 |
| 9. Probate | 60 | 70 | 60 | 60 | 55 | 60 | 55 | 55 | 55 | 50 | 40 | 55 | 40 | 35 | 35 | 35 | 35 | 50 |
| 10. Securities Litigation | 85 | 75 | 50 | 75 | 75 | 75 | 60 | 60 | 55 | 50 | 40 | 70 | 40 | 35 | 35 | 60 | 35 | 60 |

[A9993]

We have previously referred to Judge Bauer's determination of normal hourly charges in his recent decision. The only counsel who were involved both in the cases before him and in these cases are Messrs. Hartunian and Pressman for whom he found $100 per hour to be a normal charge.

Consistent with our analysis in connection with the Goldberg group, we find that $90 per hour is a fair normal charge for Messrs. Sachnoff, Hartunian, Pressman and Sullivan; $75 per hour for Messrs. Schrager, Gordon, Allen and Harte; $60 per hour for Messrs. Merrick and Forde; and $45 per hour for Messrs. Beigel, Evans, Greenwald, Perlman, Hirsch and Rosenzweig. In addition, we find as previously, that $10 per hour is normal for para-legals. Based on the foregoing normal hourly rates, the aggregate normal hourly charges for the Sachnoff group is $151,782.50, as reflected on the following schedule:

### FEE CALCULATION SCHEDULE

| | Hours | Rate | Total |
|---|---|---|---|
| Sachnoff | 455 | $90 | $40,950 |
| Schrager | 9 | 75 | 675 |
| Gordon | 578 | 75 | 43,350 |
| Allen | 6 | 75 | 450 |
| Merrick | 2 | 60 | 120 |
| Beigel | 18 | 45 | 810 |
| Evans | 33 | 45 | 1,485 |
| Greenwald | 6 | 45 | 270 |
| Perlman | 2 | 45 | 90 |
| Hirsch | 4 | 45 | 180 |
| Rosenzweig | 12 | 45 | 540 |
| Para-legals | 20 | 10 | 200 |
| Total Sachnoff firm | | | $89,120 |
| Sullivan | 57½ | 90 | $ 5,175 |
| Harte | 200½ | 75 | 15,037.50 |
| Forde | 211 | 60 | 12,660 |
| Hartunian and Pressman | 331 | 90 | 29,790. |
| Total Sachnoff group | | | $151,782.50 |

For the reasons previously set forth, we find no cause to adjust the normal hourly rates to reflect any additional

factors such as contingency, complexity or amount of the recovery. Accordingly, the petition of the Sachnoff group is allowed in the amount of $151,782.50 for fees, and $12,333.85 for reimbursement of out-of-pocket expenses.

## GENERAL OBSERVATIONS

■ As the foregoing analysis reflects, we agree with the recent decisions which emphasize that the initial inquiry in awarding fees in class actions should involve a determination of the number of hours devoted by counsel to the services of the class. Thereafter, a fair normal hourly charge should be determined for each of the attorneys involved, recognizing differentials depending on the experience, standing and skill of each. After a determination of what would be a normal fee for the services of each, adjustments should be made upwards or downwards to reflect special considerations such as contingency, complexity, amount of recovery, relative recovery to members of the class, inducement to counsel to serve as private attorneys general, duplication of services, public service considerations, etc.

We believe strongly in class actions and the objectives of Rule 23 of the Federal Rules of Civil Procedure which is intended to enlarge their utility. The principal attacks on the rule are largely the result of conduct by counsel for plaintiffs in some cases who have acted as though the rule was adopted for their benefit rather than for the multitude of individuals comprising the class or classes whose rights they were presumably vindicating. Quick, cheap settlements, conflicting representation of more than one class, side deals for the payment by defendants of plaintiffs' counsels' fees, exorbitant fees, misuse or abuse of the class action, etc., have brought justifiable criticism of Rule 23 in action. It would be ironic indeed if class actions and the opportunity which Rule 23 presents to redress grievances which heretofore went unredressed were to be restricted or eliminated as a result of the conduct of a very small segment of the bar specializing in plaintiffs' representation.

■ The courts, of course, have the ultimate power and responsibility to prevent abuse. One important step in this direction is for the court to supervise the conduct of class actions from their inception. Had that been done in this case, much of the competition between counsel, confusion and duplication of effort might well have been avoided.

■ Another is to establish the proposition enunciated in the decision by the Third Circuit in the *Lindy Bros.* case, *supra*, that the services devoted to representing the class and not the amount recovered should be the "lodestar" of fee allowances.

The combination of early control and fees based primarily on services rather than amount recovered will go a long way towards eliminating most of the abuses which have given rise to the attacks on Rule 23. At the same time, we find it difficult to believe that skilled lawyers will be unwilling to serve the public interest and pursue the rights of class members under a fee formula which results in the kind of allowances represented herein. If the present plaintiff class action bar can find richer rewards elsewhere, we have no doubt that other competent counsel will step forward. A substantial number of the class action cases now filed challenging allegedly unconstitutional state statutes, discrimination on grounds of race or sex, deprivations of civil rights, etc., are being brought by very competent young lawyers who are more motivated by public service than money.

This is not to suggest that economic inducement to private attorneys general should be eliminated. On the contrary, reasonable fees for skilled services resulting in benefit to a large number of persons who would otherwise not enjoy that benefit is highly desirable and completely consistent with the objectives of Rule 23, as well as the finest traditions of the bar.

How does all of the foregoing relate to this case? We have already discussed at length the relevant factors governing our determination of reasonable fees. No private attorney in this case can seriously contend that the hours and rates are inaccurate or unfair. The only possible bases for attacking the allowances is that a higher than normal rate should be allowed routinely in class actions or that the amount recovered should govern regardless of time devoted or services rendered.

While we reject the percentage of recovery standard for determining fees, it may be noted in passing that the aggregate of fees here allowed amounts to $336,331.25, or almost 15 per cent of the $2,300,000 combined cash and credit settlement and almost 19 per cent of the $1,800,000 cash fund. Since the real value of the $500,000 in credits to the members of the class is open to some question in light of substantial recent increases in coal prices, the latter may be a more accurate representation of the portion of the settlement allocated to attorneys' fees.

Of the $336,331.25 in total fees, $200,118.75 are to be paid to private counsel and $136,212.50 is the fair value of the services rendered by the Attorney General's office. Given the fact that there was little contingency and that the Attorney General of Illinois participated throughout, we believe the fees allowed to private counsel to be eminently fair.

■ We have previously commented on the quality of the information submitted by all counsel in support of their fee applications. As indicated, we have had to deal with unsubstantiated estimates of hours devoted to the cases, general statements of the nature of the services rendered, lump sum statements of hours involved, etc. We recognize that detailed, specific information on hours and services has not always been required in the past. As a result, counsel may not have understood the necessity for maintaining records from which such information could be elicited. Accordingly, we have generally accepted the affidavits of counsel as to their time. In future cases, however, we will require detailed statements of time and services with substantiating documentation as the court in *Lindy Bros., supra*, indicated should be presented in support of fee requests.

One final comment. We have previously held hearings on the fee allowances and counsel have had a full opportunity to educate us through memoranda, exhibits, etc., as to the respective contributions of the three groups and they have done so vigorously. We believe the allowances made herein are based on all the information available. If any counsel desires to move to amend our findings and allowances, he has ten days in which to do so. If anyone desires a hearing thereon, we will hold one. If no motion to amend or to hold a hearing is made within ten days from the date of this opinion, the findings herein will become final.